**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION**

FEDERICO TORRES, Individually and as representative and ANF of R.T., Deceased Minor; ARNULFO REYES; PATRICIA ALBARADO; MONICA ARRIOLA, Individually and ANF of J.T., Minor; ERICA BARRERA, Individually and ANF of D.R., Minor; MICHAEL BROWN, Individually and ANF of V.B.; JENNIFER DAVIS, Individually and ANF of Z.D., Minor; JENNIFER GAITAN, Individually, And ANF of J.N., Minor; ANGELI ROSE GOMEZ, Individually and ANF G.B. & A.G., Minors; LUZ HERNANDEZ, Individually and ANF of N.J., Minor; CARLA ROSE KING; TIFFANY LUNA, Individually and ANF of A.P., Minor; TAMICA MARTINEZ, Individually and ANF of R.D., Minor; TIFFANY MASSEY; YOLANDA MORALES, Individually and as ANF of Z.G., Minor; MARK MORENO and ROSEMARY MORENO, Individually and ANF of N.M., Minor; NICOLE FAYE OGBURN; MARY ANN REYES, Individually and ANF of A.S. & A.S., Minors; BIANCA RIVERA, Individually, AND ANF of G.R., Minor; JENNIEKA RODRIGUEZ; SAMANTHA RODRIGUEZ, Individually and ANF of M.J., Minor; JULIO/PRISCILLA RUBIO, Individually and ANF of M.R., Minor; BRIANA RUIZ, Individually and ANF D.G., Minor; CHRISTIAN and BRENDA SONORA, Individually and ANF V.S.; DAVID TREVINO, Individually and as ANF of A.T., I.T. & D.T., Minors; KRYSTAL UPTON, Individually and ANF of J.T. and B.T., Minors; ESMERALDA VELASQUEZ, Individually and ANF of C.V., Minor; SOFIA ZAPATA, Individually and ANF of M.S., Minor; and JANE DOE, Individually

Case No.     2:23-cv-28

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1) Negligent Marketing/ Distribution
2) Negligence
3) Negligent Entrustment
4) Negligent Hiring, Training, and supervision
5) Negligent Sale
6) Agency
7) Gross Negligence
8) Product Liability- Manufacturing Defect
9) Product Liability- Marketing Defect
10) Texas Deceptive Trade Practices Act

*Plaintiffs,*

V.

**DANIEL DEFENSE, LLC, a limited
Liability Company; OASIS OUTBACK,
LLC, a Texas limited Liability Company;
FIREQUEST INTERNATIONAL, INC.,
an Arkansas Corporation,**

*Defendants.*

## TABLE OF CONTENTS

I.      INTRODUCTION

II.     JURISDICTION AND VENUE

III.    THE PARTIES

IV.     STATEMENT OF FACTS
        A.  Uvalde Texas.
        B.  The Plaintiffs.
        C.  Daniel Defense – The Gun Maker
            C-1 Daniel Defense Aggressively Markets to Untrained Civilians and Young
            Adults.
            C-2 Daniel Defense Knows Their Weapons Are Used by Civilians in Mass
            Shootings.
            C-3 Daniel Defense Deliberately Stays Ignorant of the Human Harms & Losses
            resulting from its Reckless Marketing Practices.
        D.  Firequest International - The Hell-Fire Trigger.
        E.  The Young, Uvalde School Shooter.
        F.  The Uvalde School Massacre on May 24, 2022.
        G.  The Gun Defendants are not Shielded from Liability by the Protection of
            Lawful Commence in Arms Act (PLCAA).

V.      FIRST CAUSE OF ACTION – Negligent Marketing and Distribution of
        Unreasonable Dangerous Product as to all Defendants

VI.     SECOND CAUSE OF ACTION – Negligence to all Defendants

VII.    THIRD CAUSE OF ACTION – Negligent Entrustment as to all Defendants

VIII.   FOURTH CAUSE OF ACTION – Negligent Hiring, Training & Supervision as to
        Oasis Outback

IX.     FIFTH CAUSE OF ACTION – Negligent Sale as to Daniel Defense and Oasis
        Outback

X.      SIXTH CAUSE OF ACTION – Agency as to Oasis Outback

XI.     SEVENTH CAUSE OF ACTION – Gross Negligence as to all Defendants

XII.    EIGHTH CAUSE OF ACTION – Products Liability – Manufacturing Defect as to
        all Defendants

XIII.    NINETH CAUSE OF ACTION – Products Liability – Marketing Defect as to all Defendants

XIV.    TENTH CAUSE OF ACTION– Texas Deceptive Trade Practices Act as to all Defendants

XV.    PUNITIVE/EXEMPLARY DAMAGES - as to all Defendants

XVI.    DAMAGES
    A.  As to Plaintiff Frederico Torres, Individually and as Representative of the Estate and as Next Friend of R.T (10 years of age)
    B.  As to Plaintiff Arnulfo Reyes, Individually
    C.  As to Plaintiff David Trevino, Individually and as Next Friend of I.T. (11 years of age)
    D.  As to all Plaintiffs

XVII.    WRONGFUL DEATH AND SURVIVIAL CLAIMS

XVIII.    SPOILIATION

XIX.    DEMAND FOR JURY TRIAL

    PRAYER FOR RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, FEDERICO TORRES, Individually and as Representative and ANF of R.T., Deceased Minor; ARNULFO REYES; PATRICIA ALBARADO; MONICA ARRIOLA, Individually and ANF of J.T., Minor; ERICA BARRERA, Individually and ANF of D.R., Minor; MICHAEL BROWN, Individually and ANF of V.B., Minor; JENNIFER DAVIS, Individually and ANF of Z.D., Minor; JENNIFER GAITAN, Individually, And ANF of J.N., Minor; ANGELI ROSE GOMEZ, Individually and ANF G.B. & A.G., Minors; LUZ HERNANDEZ, Individually and ANF of N.J., Minor; CARLA ROSE KING; TIFFANY LUNA, Individually and ANF of A.P., Minor; TAMICA MARTINEZ, Individually and ANF of R.D., Minor; TIFFANY MASSEY; YOLANDA MORALES, Individually and as ANF of Z.G., Minor; MARK MORENO and ROSEMARY MORENO, Individually and ANF of N.M., Minor; NICOLE FAYE OGBURN; MARY ANN REYES, Individually and ANF of A.S. & A.S., Minors; BIANCA RIVERA, Individually, AND ANF of G.R., Minor; JENNIEKA RODRIGUEZ; SAMANTHA RODRIGUEZ, Individually and ANF of M.J., Minor; JULIO and PRISCILLA RUBIO, Individually and ANF of M.R., Minor; BRIANA RUIZ, Individually and ANF D.G., Minor; CHRISTIAN and BRENDA SONORA, Individually and ANF V.S.; DAVID TREVINO, Individually and as ANF of A.T., I.T. & D.T., Minors; KRYSTAL UPTON, Individually and ANF of J.T. and B.T, Minors; ESMERALDA VELASQUEZ, Individually and ANF of C.V., Minor; SOFIA ZAPATA, Individually and ANF of M.S., Minor, and JANE DOE, Individually; hereinafter referred to by name or as Plaintiffs, and files their Original Complaint complaining of DANIEL DEFENSE, LLC, a limited Liability Company; OASIS OUTBACK, LLC, a Texas limited Liability Company; and FIREQUEST INTERNATIONAL, INC., an Arkansas Corporation.

**I.**
**INTRODUCTION**

1.1     On May 24, 2022, Uvalde, Texas had one of the worst school massacres in Texas history at Robb Elementary School. Nineteen (19) children and two (2) teachers were killed, and countless others were injured and traumatized while school officials and hundreds of law enforcement personnel stood by, failing to act. Salvador Ramos, an 18-year-old Uvalde man, hereinafter referred to as "Shooter", with a history of mental disturbance, instability, and domestic issues illegally purchased semi-automatic weapons, ammunition, high-capacity magazines, and a Hell-Fire trigger system to use in the massacre. The shooter bought and assembled a military grade assault weapon with 30-round magazines days before his 18th birthday, and entered the Robb Elementary School unabated, wearing tactical gear, and carried out the deadliest school shooting in Texas history.

**II.**
**JURISDICTION AND VENUE**

2.1     This case is brought under The Protection of Lawful Commerce in Arms Act, 15 U.S.C. Sec. 7901, and Texas State law. Jurisdiction is conferred on this Court based upon 28 U.S.C. §§ 1331, as this case involves questions of federal law.

2.2     This Court also has supplemental jurisdiction over Plaintiffs' State law claims and over Defendants under 42 U.S.C. § 1367 because the state law claims are interrelated to the federal claims.

2.3     Venue is proper within the Western District of Texas, Del Rio Division, under 28 U.S.C. § 1391(b)(1) and (2) because at least one Defendant resides within this district, Defendants regularly conduct business in this district, and the events and omissions giving rise to Plaintiffs' claims occurred within this district.

### III.
### THE PARTIES

3.1     Plaintiff **Patricia Albarado** is an Individual who resides in Uvalde, Texas.

3.2     Plaintiff **Monica Arriola,** Individually and ANF of J.T., Minor, both of whom reside in Uvalde, Texas.

3.3     Plaintiff **Erica Barrera,** Individually and ANF of D.R., Minor, both of whom reside in Uvalde, Texas.

3.4     Plaintiff **Michael Brown,** Individually and ANF of V.B., Minor, both of whom reside in Uvalde, Texas.

3.5     Plaintiff **Jennifer Davis**, Individually and ANF of Z.D., Minor, both of whom reside in Uvalde, Texas.

3.6     Plaintiff **Jennifer Gaitan,** Individually and ANF of J.N., Minor, both of whom reside in Uvalde, Texas

3.7     Plaintiff **Angeli-Rose Gomez**, Individually and ANF of G. B & A.G., Minors, all of whom reside in Uvalde, Texas.

3.8     Plaintiff **Luz Hernandez**, Individually and ANF of N.J., Minor, both of whom reside in Uvalde, Texas.

3.9     Plaintiff **Carla Rose King** is an Individual who resides in Uvalde, Texas.

3.10    Plaintiff **Tiffany Luna,** Individually and ANF of A.P., Minor, both of whom reside in Uvalde, Texas

3.11    Plaintiff **Tamica Martinez,** Individually and ANF of R.D., Minor, both of whom reside in Uvalde, Texas

3.12    Plaintiff **Tiffany Massey**, is an Individual who resides in Uvalde, Texas

3.13    Plaintiff **Yolanda Morales** Individually and ANF of Z.G., Minor, both of whom reside in Uvalde, Texas

3.14    Plaintiffs **Mark Moreno and Rosemary Moreno** Individually and ANF of Z.G., Minor, both of whom reside in Uvalde, Texas

3.15    Plaintiff **Nicole Faye Ogburn** is an Individual who resides in Uvalde, Texas.

3.16    Plaintiff **Arnulfo Reyes** is an Individual who resides in Uvalde, Texas.

3.17    Plaintiff **Mary Anne Reyes,** Individually and ANF of A.S and A.S, Minors, all of whom reside in Uvalde, Texas

3.18    Plaintiff **Bianca Rivera**, Individually and ANF of G.R., Minor, both of whom reside in Uvalde, Texas.

3.19    Plaintiff **Jennieka Rodriguez** is an Individual who resides in Uvalde, Texas.

3.20    Plaintiff **Samantha Rodriguez,** Individually and ANF of J.M., Minor, both of whom reside in Uvalde, Texas.

3.21    Plaintiffs **Julio and Priscilla Rubio**, Individually and ANF of M.R., Minor, both of whom reside in Uvalde, Texas.

3.22    Plaintiff **Briana Ruiz**, Individually and ANF of D. G., Minor, both of whom reside in Uvalde, Texas.

3.23    Plaintiffs **Christian and Brenda Sonora,** Individually and ANF V.S.; Minor, all of whom reside in Uvalde, Texas

3.24    Plaintiff **Federico Torres,** Individually and ANF of R.G., Deceased Minor, who resides in Uvalde, Texas.

3.25    Plaintiff **David Trevino**, Individually and ANF of A.T., I.T. & D.T., Minors, all of whom reside in Uvalde, Texas.

3.26    Plaintiff **Krystal Upton,** Individually and ANF of J.T. and B.T., Minors, all of whom reside in Uvalde, Texas.

3.27    Plaintiff **Esmeralda Velasquez**, Individually and ANF of C.V., Minor, both of whom reside in Uvalde, Texas.

3.28    Plaintiff **Sofia Zapata**, Individually and ANF of M.S., Minor, both of whom reside in Uvalde, Texas.

3.29    Plaintiff, **Jane Doe**, individually.

3.30    **Daniel Defense, LLC a/ka Daniel Defense, Inc. ("Daniel Defense")** is a limited liability company with its principal office in Black Creek, Georgia. At all relevant times, Daniel Defense was engaged in the business of researching, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising guns, including AR-15 style semi-automatic rifles, for use by untrained civilians and young adults. Daniel Defense may be served with process by serving its registered agent, Marvin C. Daniel, at 101 Warfighter Way, Black Creek, Georgia 31308.

3.31    **Oasis Outback, LLC ("Oasis")** is a Texas limited liability company with its principal office in Uvalde, Texas. Oasis Outback is a firearms dealer in the business of selling guns, including AR-15 style semi-automatic rifles, to untrained civilians and young adults in Uvalde, Texas. Oasis Outback served as the local gun dealer for Daniel Defense to complete the sale of guns and ammunition to the Uvalde school shooter. Oasis Outback may be served with process by serving its registered agent, William Randy Klein, at 236 E. Nopal St. Uvalde, Texas 78801.

3.32    **Firequest International, Inc. ("Firequest")** is an Arkansas corporation with its principal place of business in El Dorado, Arkansas. Firequest is an online retailer and supplier of shooting equipment, firearm parts, and firearm accessories. Firequest designed, manufactured, marketed, and sold an accessory trigger system, Hell-Fire Gen 2, that is used to convert a semiautomatic rifle into the equivalent of a machine gun. Firequest is in the business of selling accessory trigger systems like the Hell-Fire Gen 2 trigger system, to untrained civilians, young adults, and minors in Uvalde, Texas. The Hell-Fire Gen 2 trigger system is nearly identical to illegal bump stocks and allows a rifle to fire at a rate like a fully automatic weapon. Firequest designed, manufactured, marketed, and sold the Hell-Fire Gen 2 trigger system to the Uvalde school shooter. Daniel Defense, Oasis Outback, and Firequest, are collectively referred to in this Complaint as the "**Gun Defendants**." Firequest may be served with process by serving its registered agent, Lisa McCuistion, at 505 East 5th Street, El Dorado, Arkansas, 71730.

## IV.
## STATEMENT OF FACTS

### A. - UVALDE, TEXAS

4.1    Uvalde, Texas is a small rural community located 80 miles from the Mexican border. Uvalde has approximately 25,000 residents, a majority of whom are Latino.[1] It is a tight knit, friendly community where everyone knows everyone, the Uvalde residents are hard-working people that still believe in a sense of community and helping others. Located just south of the Uvalde town square, Robb Elementary School was a public education institution for children attending kindergarten through the fourth grade. The Plaintiffs herein were the small children attending their last day of school before summer break, their parents, and schoolteachers, all of whom were present at Robb Elementary during the tragic events that occurred on May 24, 2021.

---

[1] United States Census Bureau, https://www.census.gov/quickfacts/uvaldecountytexas.

## B. - THE PLAINTIFFS

4.2     Plaintiff Federico Torres brings this suit individually, as a representative, and as next friend of R.T., who was 10 years old at the time of his death. R.T. was described as an outgoing little boy who loved being outside. He had many hobbies such as Pokémon, playing football, and playing video games. Many describe him as always having a smile on his face. On the day of the shooting R.T. was a student in classroom 111, the same classroom the shooter barricaded himself in for 77 minutes. Unfortunately, R.T. did not survive the brutal attack. The Torres family waited a horrifying 12 hours after learning of the shooting before they found out if R.T. was one of the child victims who would not be coming home that evening. Federico Torres and his family have lost the love, support, nurture, and companionship they would have shared with their son for the rest of their lives.



*R. T.*

4.3     Plaintiff Arnulfo Reyes is a surviving Robb Elementary School teacher who was shot three times on May 24, 2022, as he attempted to lock the door to his classroom, room 111. Mr. Reyes recalls hearing a loud noise and pieces of wall debris flying through the classroom in the moments leading up to the massacre. Fearing the worst, Reyes ordered his students to get under their desks, but it was too late. The shooter burst into Mr. Reyes' classroom and immediately aimed his firearm at Mr. Reyes and shot twice into his body. The shooter's first shot caused Reyes to fall to the ground and bleed onto the floor as his pupils screamed and fell around him. The shooter thereafter taunted Reyes, unsure if he had murdered his intended victim, as he snatched Reyes' phone and dropped it repeatedly on his back in an attempt to get a reaction, apparently to determine if Mr. Reyes was dead. The shooter intentionally dropped blood and cold water onto Mr. Reyes' face to see if he would flinch and was still alive. The shooter, unsatisfied, again fired his modified, automatic firearm into Mr. Reyes' body. Mr. Reyes was unaware whether he would live or die and feared he would bleed to death. Mr. Reyes was in agony but had to keep still and quiet to avoid being shot again.  Mr. Reyes heard his students screams and cries as they were murdered by the shooter for 77 minutes. Mr. Reyes spent over a month in the hospital after the shooting to treat his wounds until his release in a wheelchair. He walked with a cane, had a plasma machine pumping plasma into the wound on his back and will have permanent damages from these injuries for the rest of his life.  Mr. Reyes has not returned to teaching and is likely unemployed for the remainder of his life.  Aside from the mental trauma, anxiety, depression, and PTSD that he currently suffers from and will in all likelihood suffer for most, if not, all of his remaining life, he lives with constant pain and will experience that pain for the foreseeable future.



*Arnulfo Reyes*

4.4    Plaintiff Patricia Albarado, a Robb Elementary School teacher, was in her shared classroom 102 on the day of the massacre watching a movie with her students and co-teacher Plaintiff Nicole Faye Ogburn. Shortly after 11 A.M., Mrs. Albarado heard loud, pounding noises against the building. Mrs. Albarado looked outside her classroom room window in horror as she saw the shooter, dressed in black, shooting towards her window. The shooter aimed his modified assault rifle at room 102, fired his rifle, and shattered the window. Mrs. Albarado attempted to protect her young students by informing the class there was a shooter outside and to get low to the ground. Ms. Albarado and her students hid underneath their desks, storage bins, and window curtains. As Ms. Albarado lay in the fetal position on the floor, she recalls hearing at least 800 "shots" fired. Ms. Albarado's co-teacher, Plaintiff Nicole Faye Ogburn called 911. Unknown if the shooter was about to burst into her classroom, Mrs. Albarado texted her husband on her apple watch, *"There is an active shooter, help. I love you."* Mrs. Albarado recalls law enforcement entering her classroom approximately forty minutes after she first saw the shooter outside her

window and the time between these events was the most traumatizing, anxious, time of her life. She could barely walk, and her legs were numb as the enforcement officials ordered the class to evacuate through the shattered window the shooter broke sometime before. Mrs. Albarado, Plaintiff Nicole Faye Ogburn, and their young students ran across the Robb Elementary School campus to the neighboring funeral home. As they ran, shots continued to be heard behind them.

4.5     Plaintiff Monica Arriola brings this suit individually and as next friend of J.T., who was 10 years old at the time of the shooting. J.T.  was across the hall from the barricaded room in classroom 104 or 105. The school shooter peered into his classroom window at J.T. as he was terrorizing the school, and in that moment, J.T. thought he was going to die. J.T was one of the last children evacuated from the school by a broken window and Monica Arriola did not reunite with her child until 4 hours after she learned of the shooting.  During his time, Monica Arriola did not know if her son was alive or dead but as with all the parents who did not know if their children were alive, she feared the worst.

4.6     Plaintiff Erica Barrera brings this suit individually and as next friend of D.R., who was 11 years old at the time of the shooting. D.R described hearing a lot of "firework" noises and screams from his classroom 105 on the day of the shooting before he was evacuated through a broken Robb Elementary School window.  Like most of the Plaintiffs in this Complaint, he was friends with several children who perished in the other classrooms and throughout the ordeal he feared that he would die.

4.7      Plaintiff Michael Brown brings this suit individually and as next friend of V.B., who was 9 years old at the time of the shooting. V.B was in the cafeteria on the day of the shooting when gunshots rang through the school. School staff instructed him to get under the stage, where he was surrounded by the crying and yelling of his fellow classmates. He feared he would die, and

the screams of his classmates made the ordeal unbearable. He was evacuated later through the cafeteria front door. V.B. was friends with 2 children that rode his bus that did not survive.  He has severe trauma, anxiety and depression as a result of the frightening experience of that day.

4.8     Plaintiff Jennifer Davis brings this suit individually and as next friend of Z.D., who was 10 years old at the time of the shooting. Z.D. was in classroom 103 as the shooter entered the school and was one of the children evacuated by a broken window. It wasn't until 4'oclock in the afternoon until she was reunited with her parent at the civic center. Ms. Davis did not know if her daughter was alive or dead, like most parents, she feared the worst. Z.D. learned in the days after the shooting that her best friend did not survive the massacre.

4.9     Plaintiff Jennifer Gaitan brings this suit individually and as next friend of J.N., who was 10 years old at the time of the shooting. J.N. was in room 108 on the day of the shooting with her classmates. J.N. recalls the screaming and terror she experienced that day. J.N.  witnessed her classmate, and friend, injured when a bullet struck her nose. J.N. also recalls a bullet hitting the wall of her classroom. J.N. was evacuated through the side door at Robb Elementary School.  She feared for her life and must live her life with the image of her dead classmates which she cannot escape.

4.10     Plaintiff Angeli-Rose Gomez brings this suit individually and as next friend of G.B and A.G. G.B. and A.G. were both on campus at Robb Elementary on the day of the massacre, classrooms unknown. It is believed that despite the attempts by law enforcement to prevent her, Ms. Rose-Gomez was able to locate her children and remove them from the horrific situation.  She has endured arrests, condemnation and ostracization as a result of her activities to protect her children.

4.11     Plaintiff Luz Hernandez brings this suit individually and as next friend of N.J., who was 9 years old at the time of the shooting. N.J. was in room 114 during the massacre. N.J. remembers his teacher telling his class to hide and get under their desk as gunshots echoed throughout the school. N.J. thought he was being kidnapped as he was evacuated through the school door by law enforcement officials and transported in a van to the civic center. Like most Plaintiffs herein, N.J. lost a few childhood friends due to the actions of the shooter.  Like other plaintiffs, he feared for his life throughout the ordeal.

4.12     Plaintiff Carla Rose King, a teacher at Robb Elementary School, had just dismissed her students for lunch and was in her classroom, 129, alone.  Mrs. King recalls hearing a sudden and unexpected loud, "bang" noise causing shock and confusion. The bangs continued to ring, and she thought the sounds may be gunshots. Mrs. King peered out her classroom window and did not see anything. She attempted to call the school's front office but there was no answer. She tried to call her daughter, but there was no answer. No one answered. Unknowing and terrified, Mrs. King hid in her room until law enforcement came from the hallway to evacuate her. Unable to move, she was carried out by officials to the main office of the school before she was transported to the civic center.  She remains traumatized, anxious and depressed.

4.13     Plaintiff Tiffany Luna brings this suit individually and as next friend of A.P., who was 9 years old at the time of the shooting. A.P. was located in room 105, across the hall from the barricaded shooter on the day of the incident. A.P. recalls the shooter speaking Spanish in the hallways and saw smoke billowing into her classroom from the constant gunfire. A.P. was evacuated from campus through a broken window. A.P. lost two cousins in the shooting and will be affected by the loss and days events for the rest of her life.

4.14    Plaintiff Tamica Martinez brings this suit individually and as next friend of R.D., who was 10 years old at the time of the shooting. R.D. was in classroom 105 during the massacre before he was evacuated from his classroom through a broken window. As he escaped, he was scratched by glass shards along his arms and backside. R.D. did not reunite with his parents for approximately 4 hours after the ordeal at the civic center. During the excruciatingly long period, his parents were not aware if he was alive.

4.15    Plaintiff Tiffany Massey is a Robb Elementary School teacher who was present in her classroom 103 on the day of the shooting with twelve students. Mrs. Massey recalls hearing banging noises coming from the back of her classroom near the parking lot shortly after 11:30 a.m. A student ran up to Mrs. Massey stating that a man was outside with a gun. A teacher in an adjoining room entered classroom 103 and told the class to get down. Wanting to call for aid, Mrs. Massey had left her phone on her desk, so she asked one of her students, Plaintiff Z.D. minor, to borrow her phone. At approximately 11:47 a.m. Mrs. Massey texted 911 and her husband. A 911 dispatcher sent a text message response, "officers were outside." Mrs. Massey recalls the constant gunfire. At no point in the massacre did she receive a notification or alert from alert applications. Law enforcement appeared outside her classroom window and told her class needed to evacuate through their window and pulled them through the window one by one. Like other teachers and students named herein evacuated by window, Mrs. Massey and her class ran to the nearby funeral home to wait to be transported to the civic center.  It is unknown the exact time she was held hostage, but she like the other victims suffered trauma and anxiety as a result of the shooting.

4.16    Plaintiff Yolanda Morales brings this suit individually and as next friend of Z.G., who was 9 years old at the time of the shooting. Z.G. was on campus, outside on the playground, as the shooter approached the school and fired gunshots into the air. Z.G. rushed along with her

classmates into the school for cover as her teacher attempted to contact someone on her cell phone. Z.G. heard gunshots, screaming, and her classmates' cries for home. Eventually, Z.G. was evacuated by the school door. Z.G. knew one friend who was injured and one who perished in the massacre. She relives the events as do most of the Plaintiff whenever there is a loud noise or startled. She has trouble sleeping and traumatized when something happens that makes her recall the day and the fear of now knowing it she would live.

4.17    Plaintiff Mark Moreno and Rosemary Moreno bring this suit individually and as next friend of N.M., who was 7 years old at the time of the shooting. N.M was within Robb Elementary School on the day of the shooting, his classroom is unknown. N.M. recalls being evacuated by a broken window. N.M. had one cousin who perished in the incident and knew friends who did not survive.  Like the others, he still relives the incident regularly, including most nights.

4.18    Plaintiff Nicole Faye Ogburn is a Robb Elementary School teacher who shared classroom 102 with Plaintiff Patricia Albarado. Mrs. Ogburn recalls hearing sounds she describes as "metal hitting brick" outside her classroom on the day of the shooting. As she and her co-teacher investigated the noises, Mrs. Ogburn saw the shooter outside their window, dressed in black, pointing his assault rifle towards the school playground and firing. She, along with Plaintiff Mrs. Albarado ordered their fifteen students to get down. Mrs. Ogburn remembers seeing bullets hitting the classroom window and accumulating on the classroom floor. She and her students crawled on their hands, knees, and stomachs across the classroom floor for cover below the room's built-in cabinets. She used her apple watch to call 911, however her first call failed. She called again, this time the call was answered by a 911 dispatcher, however the call failed again. Mrs. Ogburn called a third time, and was connected again to a 911 dispatcher. She quietly whispered into her apple

watch that there was an active shooter at the school in the 4th grade building. Afraid to remain on the call, she hung up. Mrs. Ogburn attempted to console her crying students by holding their hands and praying. A brave student laid his body on top of Mrs. Ogburn in an attempt to protect her. If any teacher or student attempted to stand, they would be in the line of fire. What felt like an hour to Mrs. Ogburn was in reality only a few moments. Approximately thirty to forty minutes after the first shots were fired, law enforcement came into her room searching for the injured, and ordering evacuations. Mrs. Ogburn and Plaintiff Mrs. Albarado moved a bookshelf away from the wall so their classroom could evacuate through the broken window. As the students left through the window many were scraped and bruised, cut, and bleeding.

4.19    Plaintiff Mary Ann Reyes brings this suit individually and as next friend of A.S. and A.S., who were 9 and 8 years old at the time of the shooting. 9-year-old A.S was located in classroom 106 on the day of the shooting and recalls the "vibrations" from the shooter's gun. A.S. was evacuated by broken window and did not reunite with his parents for approximately 3 hours after his evacuation. Several of A.S.'s friends did not survive. 8-year-old A.S. was also on campus on the date of the incident and located in room 22. A.S recalls he comforted another distressed student during the massacre and was eventually evacuated by one of the doors. A.S. knew one of the teachers who did not survive.  Most of the Plaintiffs lost friends during the shooting who were playing with them one day and never in their lives again after the event.

4.20    Plaintiff Bianca Rivera brings this suit individually and as next friend of G.R. who was 7 years old at the time of the shooting. G.R. was on campus at Robb elementary on the day of the massacre, classroom unknown.

4.21    Plaintiff Jennieka Rodriguez is a Robb Elementary School teacher who was in her classroom 105 with thirteen students on the day of the massacre. The children were settling down

after the awards ceremony watching a movie in the classroom when Mrs. Rodriguez heard banging noises coming from the roof. Mrs. Rodriguez had put in a maintenance request earlier in the day regarding the classroom's hot temperature and first thought the maintenance team were working on the school's AC unit.  As the banging continued, she looked out her classroom's west-facing window and saw a black duffle bag on the ground outside, again thinking it belonged to the maintenance workers. At 11:32 a.m., The RAPTOR alarm went off on her phone, which was not connected to the school's WI-FI. Like her training, Mrs. Rodriguez stepped outside her classroom to make sure her door was locked and slammed it shut. In doing so, she saw her co-worker, teacher Mrs. Garcia also checking her door. Mrs. Rodriguez told her students to get down in the classroom and hid herself. A student who was on the opposite side of the classroom near the window mouthed, "Do I go to you?" and lost consciousness in the process of crawling to the safer location near Mrs. Rodriguez. At 11:40 a.m., Mrs. Rodriguez's phone received another alert, this time from a group chat shared by some of the teachers at Robb Elementary School. The message in the group chat was from Teacher Elsa Avila stating, "I'm shot, help." Another teacher in the chat messaged, "Where are you at?" which received no response. As the banging continued, Mrs. Rodriguez received another text, this time from her brother, "It is not a drill, there is a shooter in the school." All of these increased her anxiety and fear as well as her concern for her students and fellow teachers. At approximately 12:05 p.m. She heard voices coming from the hallway outside her room asking the shooter Ramos to come out of the classroom and put his weapon down in English, then again in Spanish. Her students began to cheer when they saw police lights from their classroom window, but Mrs. Rodriguez told them to remain quiet. The sound of breaking classroom windows in other classrooms began, until her window was finally broken by law enforcement. Mrs. Rodriguez used her strength to place a bookshelf and chair in front of her window to aid her

students evacuation out the window. As she pushed her students out the window, law enforcement was catching them from outside. Mrs. Rodriguez was the last person out her classroom and fled with her students to the funeral home across the street to wait to be taken to the civic center. Her co-worker, Mrs. Garcia, did not survive that massacre, which haunts her, and will for the remainder of her life.  She feared for her life and her students throughout the evacuation but had no other option.

4.22    Plaintiff Samantha Rodriguez brings this suit individually and as next friend of M.J., who was 10 years old at the time of the shooting. M.J. was in classroom 109 during the events of the massacre. M.J. recalls comforting his classmate during the ordeal when he witnessed his teacher shot by one of the shooter's bullets and fall to the ground. M.J. was evacuated through a broken window and reunited with his family after approximately 3 hours. M.J.'s best friend and named Plaintiff herein, R.T. was brutally murdered.  The tragedy has resulted in 8–12-year-olds coming face-to-face with their worst fears at an age they should not be faced with such reality.  It will be with them forever and is one of the major factors in the increased suicide rate they face along with higher rates of drug abuse and alcoholism.  Despite our best efforts, "normal" has a very different meaning for all of those inside Robb Elementary on May 24, 2022.  One the rest if us can only imagine in our worst nightmares.

4.23    Plaintiffs Julio and Pricilla Rubio bring this suit individually and as next friend of M.R. who was 10 years old at the time of the shooting. M.R. was in classroom 103. M.R. recalls an immediate fear as soon as she heard the shooter in the school and began to pray. M.R.'s cousin was also in the school and M.R was terrified something bad would happen to her. M.R. was evacuated by a broken window and scraped her leg on the window's broken glass in the process. M.R. was not reunited with her family until the early evening hours at the civic center.

4.24    Plaintiff Briana Ruiz brings this suit individually and as next friend of D.G., who was 9 years old at the time of the shooting. On the day of the massacre, D.G was in room 109. D.G. witnessed the shooter outside his classroom and recalls the shooter mocking him. D.G. was one of the last children evacuated from his classroom by broken window. D.G. arms were scraped and bruised from the window's glass shards. D.G.'s cousin, Eliahna Garcia, did not make it out alive that day.  He has nightmares as a majority of the victims and still can become moody, silent, and scares easily.

4.25    Plaintiffs Christian and Brenda Sonora bring this suit individually and as next friend of V.S. who was 10 years old at the time of the shooting. V.S. is a special needs student and was at recess with her classmates when she saw the shooter, dressed in black, approach the school. V.S. witnessed the shooter aim his firearm into the sky and shoot. V.S.'s teacher grabbed V.S., along with two other students, and pulled them into the school restroom, turned off the lights, and told them to be quiet. V.S. recalls watching her teacher remain silent, and texting on her cellphone over and over again. V.S. was evacuated by one of the school doors as her teacher led them out hurriedly. No law enforcement officials came to aid them in their escape. As V.S. escaped the school, she heard shooting and yelling everywhere. V.S. and her classmates ran to the closest highway for refuge. V.S. was reunited down the highway at approximately 12:30 p.m. on that day. A cousin of V.S. did not survive.

4.26    Plaintiff David Trevino brings this suit individually and as next friend of I.T., A.T., and D.T. who were 11, 10, and 8 years old at the time of the shooting.  D.T. was outside the school on campus when he witnessed the shooter approach Robb Elementary School and shoot his firearm into the air. In a fearful state, D.T. entered the school to warn and evacuate his two other siblings before the shooter violently entered. D.T. was successful and the three minors escaped mere

moments after the shooter began firing his weapons into the classrooms. I.T., shocked by the events, experienced a medical emergency, and collapsed on the outdoor school walkway in her escape. I.T. was rushed to the emergency room with heart complications. I.T. has never had a heart condition until the event and it is highly likely the stress, fear and, shock caused her heart problems which have continued.

4.27    Plaintiff Krystal Upton brings this suit individually and as next friend of J.T. and B.T. who were 10 and 8 years old at the time of the shooting. J.T. was in classroom 103 when the shooter entered the west door of Robb Elementary School. J.T was evacuated through a broken window and was one of few children evacuated to the nearby funeral home. B.T was also present in the school, he doesn't recall where, and was later evacuated to the civic center.  Both J.T. and B.T.  lost two cousins in the massacre.  Throughout their separation and throughout the event, they feared for their lives.

4.28    Plaintiff Esmeralda Velasquez brings this suit individually and as next friend of C.V., who was 7 years old at the time of the shooting. On the day of the incident, C.V. was in classroom 116 and it is believed she was evacuated by one of the school's back doors.  C.V. was friends with a few of the children who did not survive.

4.29    Plaintiff Sofia Zapata brings this suit individually and as next friend of M.S., who was 10 years old at the time of the shooting. M.S. was in room 109 during the deadly event. M.S. recalls an individual shooting the window from outside the school.  M.S. was evacuated through a broken school window. M.S. had two cousins who perished on that fateful day, he did not know if the shooting into his classroom would result in his death.

## C. - DEFENDANT DANIEL DEFENSE -THE GUN MAKER

4.30    Daniel Defense is a Georgia-based gun manufacturer who proudly markets itself as a military weapons dealer. Daniel Defense researches, develops, designs, manufactures, markets, and sells semi-automatic weapons, including AR-15 style rifles, for use and possession by civilians and young adults which have the ability to be altered into military style weapons with little to no effort or expertise.

4.31    The mass shooting at Robb Elementary was enabled by the illegal, reckless, and negligent actions of Defendant Daniel Defense, which profited from the deceptive marketing of its AR-15 rifles, including the DDM4 V7 rifle that Shooter Ramos purchased. The weapon is marketed in a manner that especially appealed to young men like Ramos with anti-social tendencies and violent impulses and whose acquisition of weapons designed for use in war transforms those tendencies into horrific acts of violence. These facts were illustrated in the September 12, 2022, Unites States Senate letter to the Federal Trade Commission (FTC) urging the Commission to undertake investigation and regulation of the unfair and deceptive advertising practices used by the firearm industry (alluding to Daniel Defense). This letter was signed by twelve United States Senators: Richard Blumenthal, Edward Markey, Christopher Murphy, Richard Durbin, Sheldon Whitehouse, Cory Booker, Dianne Feinstein, Amy Obuchar, Kirsten Gillibrand, Alex Padilla, Elizabeth Warren, and Jack Reed. Daniel Defense's marketing is deceptive and intended to attract those with violent or anti-social tendencies. Daniel Defense does not require any type of identification or in any way try and determine if their online sales are legal. Upon information and belief, the sale to the shooter Ramos, transaction between (Daniel Defense and shooter Ramos) occurred while Ramos was not yet 18 and was therefore illegal.

4.32     Daniel Defense profited from the sale of $528 million AR-15 style rifle sales from 2012 to 2021.[2] Daniel Defense makes millions off the sale of their assault weapons but does not track death, dangers, or crimes resulting from use of their guns, nor does Daniel Defense educate consumers of the dangers of use of their weapons by young adults. They do not offer or even suggest that gun safety classes should be taken by those not trained in the use of their products.

## C-1. - DANIEL DEFENSE AGRESSIVELY MARKETS TO UNTRAINED CIVILIANS AND YOUNG ADULTS

4.33     Although ninety percent of its sales are to civilians, Daniel Defense aggressively markets itself as a military weapons dealer, and in doing so, misleads consumers into believing they are buying military sponsored weapons. The advertising is false and misleading.  It glamorizes the use of Daniel Defense products.

4.34     Daniel Defense markets its rifles to civilian consumers in a manner that appeals to adolescent young men attracted to violent combat and military fantasies and implies that civilians can use their weapons for offensive combat-like missions, thereby increasing the risk that one of these adolescent young men will use the rifle to perpetrate an act of mass violence. The Uvalde shooter was the perfect customer for Daniel Defense: a troubled, violent loner who spent much of his free time on the internet and social media and who fantasized about reenacting video game combat in real life. Daniel Defense knew the risks of its marketing strategy, and like Ramos, who was drawn to notoriety and violence, Daniel Defense by its actions put innocent young school children at risk for profit. The shooting at Robb Elementary was an all-too-foreseeable outcome of Daniel Defense's decision to market its products in a manner that encouraged their illegal

---

[2] *The Committee's Investigation into Gun Industry Practices and Profits* Memorandum from Carolyn B. Maloney, Chair, Committee on Oversight and Reform, at 6 (July 27, 2022).

misuse. In its print advertising, the civilian consumer is encouraged to "use what they use:" An apparent reference to the military.



*Print advertisement available on Facebook (May 30, 2012)*

4.35    Daniel Defense's marketing includes militaristic and combat imagery as well as content specifically aimed at young consumers, referencing video games and the irreverent tone of internet meme culture. This has enabled Daniel Defense to appeal to young male civilian consumers, which can in turn translate to market growth by priming young buyers to purchase AR 15-style rifles as soon as they are legally able.  Daniel Defense hopes they will be "hooked" on the fantasy they sell and become life-long customers.  The strategy has been extremely successful to

date. Daniel Defense, in responding to these allegations invokes the protections of the 2nd Amendment provided for law abiding Americans, who are not part of the fantasy world, targets of Daniel Defense misguided patriotism, and appeal to under-age consumers who are part of the video game generation.



*Image from Daniel Defense 2022 print catalog*

4.36    Daniel Defense regularly promotes its weapons and accessories through appeals to civilian consumers attracted to the thrill, excitement, and violence of combat, without the commitment training and restraint the military imposes. While many companies employ marketing that extols the virtues of military service, Daniel Defense's marketing promotes the company's AR-15-style rifles in a context that implies they may be used by civilians for offensive, combat-like missions. Daniel Defense's marketing images depict men in combat gear on active battlefields telling the purchaser that is what buying this weapon will bring. The purchaser's fantasy, which until then was only internet game driven, may be only in online games, can come to life with

Daniel Defense's guns, which Daniel Defense promises have been "tested, proven, and chosen" by the U.S. Military, a totally a false, misleading narrative. Daniel Defense's guns are accessible to civilian consumers unlicensed, untrained, and as young as 18 years old, and Daniel Defense targets this consumer directly. Daniel Defense intentionally misleads consumers in a fantasy scheme engineered for maximum profit at the expense of American lives. Daniel Defense marketed their weapons on the video games that Ramos and those like him play, including, "Call to Duty Modern Warfare", and "Grand Theft Auto".

4.37    Daniel Defense is known in the industry for its brazen and provocative marketing as its advertisements feature fast-moving, high-quality videos drowning in electronic music, featuring gun-toting young adults and allusions to popular video games and movies. Daily social media posts are littered with emojis promoting "Saturdays are for the boys," normalizing "kitchen Daniels," and promoting "not your grandpa's bolt gun." Daniel Defense promises young adults power and glamour when using its guns which it couples with the force and prestige of military grade lethality. Again, the company is suggesting that *civilian* consumers should imagine themselves in close combat with the company's AR-15-style rifles. The advertising goes beyond imagery but dearly falls under the category of "false and misleading" as the 12 United States Senators have clearly explained to the Federal Trade Commission,



*Facebook (Mar. 13, 2021)*

4.38     Daniel Defense specifically targets young children not of age to purchase its guns. Much of its heavy social media marketing is on Instagram and Twitter, which are popular with youth. Daniel Defense does not limit or age-restrict access to any of its marketing and freely allows all ages to take in its violence-based content. See Daniel Defense's advertisement below discussing training a child with a photo of a child and Daniel Defense's product.

4.39     Just days before the Uvalde massacre, Daniel Defense tweeted a picture of a toddler holding a rifle captioned with a biblical quote from the Book of Proverbs: "Train up a child in the way he should go, and when he is old, he will not depart from it." Certainly by false, deceptive advertising which clearly denies Daniel Defense any immunity under the laws and statutes of the United States.



*Twitter (May 15, 2022)*

4.40    Daniel Defense also markets its rifles' placement in violent, first-person-shooter video games. It amplifies this product placement through online and social media channels. The Daniel Defense DDM4 V7S rifle—a short-barreled version of the shooter's DDM4 V7—is featured in *Call of Duty: Modern Warfare*, and the company's social media account references and tags *Call of Duty* in many of its posts:



*Facebook (Oct. 25,2019)*

4.41    Daniel Defense admits 90 percent of its purchasers are consumers that are not military trained. In other words, Daniel Defense knows the consumers buying its military style lethal weapons are not competent to responsibly use their guns as trained military personnel are capable of doing. In directing much of its advertising at young men and adolescents, Daniel Defense chose to target a group that was particularly susceptible to advertising and disproportionately likely to misuse Daniel Defense's products. Violent first-person-shooter video games like *Call of Duty* allow Daniel Defense to indirectly market the firepower of their DDM4 rifles to teenagers and young adults through product insertion and realistic depictions of the rifle. The allure of the video game is that it allows users to experience extreme carnage through fantasy killing. Games like *Call of Duty* are popular among teenagers and young adults, including the Uvalde, Parkland, and El Paso mass shooters. And Daniel Defense has benefited from the use of

AR-15-style rifles in *Call of Duty*. In social media posts, Daniel Defense uses hashtags such as #callofduty and #cod to make its *Call of Duty* references explicit.

## C-2. - DANIEL DEFENSE KNOWS THEIR WEAPONS ARE USED BY CIVILIANS IN MASS SHOOTINGS.

4.42    It has long been recognized that providing those under the age of 21 with access to deadly weapons and ammunition poses a grave and unacceptable risk to public safety. For this reason, federal law, and many state laws, restrict access to both firearms and ammunition to juveniles and minors. As the Senate Report accompanying the passage of the Federal Gun Control Act in 1968 noted, "[t]he clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country."[3]  Plaintiffs acknowledge that in today's world, groups of violent individuals are known to enter homes and that a rapid-fire weapon may be appropriate for defense of home and family.  However, few 18-year old's have either homes or families and as such they have little need for these types of weapons.  Certainly, the gun manufacturers should, at a minimum, require proof of age and require the deliverer to report suspicious activity.  Failure to determine the age of the purchaser is certainly negligent.

4.43    Firearm manufacturers know or should know as marketers and sellers of the weapons and systems used to modify an automatic weapon, the dangers of providing firearms and ammunition to individuals under  the age of 21, certainly under the age of 18; and the ease of customizing an AR 15 rifle.

4.44    The following are examples of mass shootings covered by the mass media and which provide common knowledge and notice to manufacturers and retailers of AR rifles of their potential for misuse.

a)    The Columbine High School shooting perpetrated in 1999 by a 15-year-old and an

---

[3] S. Rep. No. 90-197, at 79 (1968).

18-year-old; resulting in the deaths of 13 people, including 12 students, wherein an AR 15 was used;

b)     The Sandy Hook Elementary School Shooting in 2012 by a 20-year-old, killing 26 people, including 20 -first grader;

c)     The Marjory Stoneman Douglass Shooting in 2018 by a 19-year-old, killing 17 people and injuring 17 others, wherein an AR-15 was used;

4.45     Between 2009 and 2022, the six deadliest mass shootings in the U.S. all involved the use of assault weapons and/or high-capacity magazines: Las Vegas (58), Orlando (49), Newtown (27), Sutherland Springs (26), El Paso (23), and Uvalde (21). Assault weapons with high-capacity magazines are disproportionately used in public mass shootings. Of the shootings where the type of weapon is known, 76 percent of those involved an assault weapon and/or high-capacity magazine that occurred in public; compared to 44 percent of those that involved a handgun.[4]

4.46     These mass shootings are just a fraction of all the shootings committed by juveniles and minors. 18 to 20-year-olds are offenders in gun homicides at a rate nearly *four times higher* than adults 21 and older. Nevertheless, or perhaps as a result of this, gun makers and sellers aggressively market directly to young adults and do everything they can to attract their attention through advertising, even going so far as using youth culture icons such as Star Wars, Fortnite, and Call of Duty in their marketing. Gun makers and sellers deliberately push their lethal weapons into the hands of unpredictable, emotional, and volatile young adult civilians knowing that it is reckless, absurd, and dangerous to the public. Gun makers and sellers understand their market audience. They target audience preferences, activities, and characteristics, and are keenly aware of the vulnerabilities and emotional variability of the young adult minds they target.  The sales to

---

[4] Everytown Research & Policy, Mass Shooting in America (as of August 15, 2022)

adults may be legal but the sales to minors are those who display dangerous qualities certainly violate their duties to Plaintiffs and are negligent.

4.47    AR-15 style, assault weapons with their rapid-fire large ammunition capacity, are time and time again the weapon of choice for mass shootings. Four of Daniel Defense's semi-automatic rifles were part of the arsenal of firearms used by the shooter that killed 60 people in Las Vegas in 2017. Smith & Wesson's assault weapons also purchased by the Uvalde school shooter have been used in some of the worst mass shootings in U.S. history including:

a.    2022 Fourth of July shooting in Highland Park, Illinois where Robert E. Crimo III, age 21, murdered 7 people using a Smith & Wesson M&P15 he purchased online.[5]

b.    2018 Stoneman Douglas High School shooting in Parkland, Florida where Nikolas Cruz, age 19, murdered 17 people. All victims were shot in under four minutes.

c.    2015 San Bernardino, California shooting where terrorists murdered 14 people using AR-15 style rifles, including a Smith & Wesson M&P15. [6]

d.    2012 Aurora, Colorado theater shooting where James Holmes, age 25, murdered 12 people using several guns including a Smith & Wesson M&P15, with a 100-round drum.[7]

### C-3.  - DANIEL DEFENSE DELIBERATELY STAYS IGNORANT OF THE HUMAN HARMS AND LOSSES RESULTING FROM ITS RECKLESS MARKETING PRACTICES.

4.48    Daniel Defense knows their assault weapons land in the hands of mass shooters but apparently stays ignorant to the number of killings and crimes caused by their weapons and their direct marketing to vulnerable and/or young adult consumers. Daniel Defense chooses not to do any studies evaluating the effects of their marketing strategies on the health and well-being of

---

[5] *Highland Park Suspect Robert Crimo Bought Rifle Used in Attack Online*, New York Post (July 6, 2022); *Illinois State Police Director Defends Decision to Give Suspected Highland Park Killer a Gun Permit in 2020*, Chicago Sun Times (July 6, 2022).
[6] *Guns Used in San Bernardino Shooting Were Purchased Legally from Dealers*, Washington Post (Dec. 3, 2015); *Florida Gunman Had Extra Ammo at School, Fired for 3 Minutes*, Associated Press (Feb. 15, 2018).
[7] *Aurora Gunman's Arsenal: Shotgun, Semiautomatic Rifle and, at the End, a Pistol,* The New York Times (July 23, 2012).

Americans and chose not to look at the cost to families and communities like Uvalde, Texas. Gun makers mistakenly believe they have blanket immunity against civil lawsuits under PLCAA,[8] discussed *infra*, and exploits the heightened susceptibility of teenage boys and young men to produce advertising that plays on this group's propensities for risky and violent behavior.

4.49    Daniel Defense's CEO and founder, Marty Daniel, makes no apologies for his company's place in the marketplace and the benefits he gains off tragedy and mass shootings. Mr. Daniel proudly told Forbes Magazine in 2017 that its sales went up after the mass shooting at Sandy Hook Elementary in 2012. Like the Uvalde school shooter, the Sandy Hook shooter was a young adult, 20 years old. Unlike other product manufacturers, the Gun Defendants are consciously indifferent to the human harms and losses caused by their intentional sales and marketing practices, especially to minors or young adults.  While Plaintiffs are <u>not</u> advocating for or suggesting that these weapons be banned, they are suing Defendants for their negligence and deceptive marketing.

4.50    Daniel Defense could stop marketing to and glamorizing guns to children and young adults and enact more prudent merchandising and marketing policies but chooses not to. Daniel Defense could provide educational marketing to the public but chooses not to. It could analyze the crime and death caused by its weapons and their role in mass shootings and the role their advertising plays but chooses not to.  In fact, Daniel Defense does not require any type of age or identity document, included, but not limited to a driver's license, passport, or government issued identification. Such failures, if not criminal, are certainly negligent.

4.51    Daniel Defense knows marketing to children and young adults is not in the public interest and increases the risk of death to Americans and children, but such a practice has proved

---

[8] Protection of Lawful Commerce in Arms Act, 15 U.S.C. 7902 *et seq.*

profitable to the Company. While Daniel Defense places profits over people they are in violation of foreseeable duties to Plaintiffs and moral duties as humans. Daniel Defense knows that doing so leads to mass shootings using their weapons. Daniel Defense makes millions off the sale of assault weapons especially after a mass shooting. Daniel Defense consciously chooses profits over the safety and lives of Americans. In the years before the Uvalde school massacre, Daniel Defense did nothing to curtail the marketing and sale of guns to untrained American youth, seeking thrills, notoriety and fame. Its business practices are reckless, deliberate, intentional, and needlessly endanger American children.

4.52    Daniel Defense knows AR-15 style, semi-automatic rifles are unsuited for recreation or casual use and possession. The origin of the AR-15 is the military M-16, and specifically designed to kill multiple people fast. Daniel Defense knows its strategy of marketing directly to youth enables untrained civilians as young as 18 years old (or younger) the power and ability to inflict unparalleled human carnage on unarmed and unprotected civilians and children. The Uvalde school shooter seamlessly bought the AR-15 style rifle directly from Daniel Defense via its eCommerce website without even a passing inquiry as to his age and had the firearm shipped directly to Uvalde, Texas to its supplier Oasis Outback. Daniel Defense has done nothing to protect Americans against their reckless marketing and business practices.  Daniel Defense's marketing is deceptive, misleading and violates the Texas Deceptive Trade Practices Act.

### D. - DEFENDANT FIREQUEST INTERNATIONAL -THE HELL-FIRE TRIGGER

4.53    The Hell-Fire trigger system, nearly identical to a bump stock, allows a rifle to fire at a rate like a fully automatic weapon. The bump stock device was banned after the 2017 Las Vegas mass shooting, but the Hell-Fire trigger systems is still legal. However, being legal and being negligent are not the same thing.  The Hell-Fire trigger system clamps to a trigger guard

behind the AR-15 trigger and presses a "finger" against the back of the trigger to increase the force that returns the trigger to its forward position, effectively decreasing the time required for the trigger to reset, allowing for a faster follow up shot. The Hell-Fire converts an otherwise semiautomatic firearm into a virtual automatic weapon so a shooter can continue firing (even with one hand) without additional physical manipulation of the trigger. The Hell-Fire trigger  firearm modifier  transforms  a semi-automatic firearm to one that can fire at a rate approaching that of a fully automatic firearm. The system installs invisibly within the pistol grip on any AR-15 style rifle and can be activated or deactivated in seconds. The system permits the shooter to have a firmer grip on the gun and stock for increased accuracy and pull the firearm trigger at a modified rate of 900 rpms. In other words, the Hell-Fire trigger gives machine gun power to a civilian *legally.*

4.54    Firequest, the manufacturer of the Hell-Fire Gen 2 Trigger System, states on their online website, "All you have to do is squeeze the trigger to shoot at rates up to 900 rpm," which is comparable to AR-15s with bump stocks that can fire between 450 and 900 rounds per minute. Firequest also claims the Hell-Fire Gen 2 is "ATF legal and compliant" and is sold with a "certificate of legality." Firequest further touts, "It is revolutionarily the best rapid-fire system for these new volatile times. Get them now before new laws outlawing. " YouTube videos linked to Firequest's website and product page for the Hell-Fire Gen 2 depict an AR-15 rifle with the Hell-Fire Gen 2 trigger system firing as a fully automatic rifle.



*Advertisement for the Hell-Fire Trigger Device*

4.55    Firequest had knowledge that the Hell-Fire system was used to facilitate school shootings with modifications to make AR rifles automatic weapons and shoot like machine guns. The "Hell-Fire" name and advertising were used in a manner to appeal and encourage young men to commit violent acts and murder by using the weapon. The Plaintiffs believe, beginning in February 2022, the Uvalde shooter purchased the Hell-Fire Generation 2 trigger System through an online purchase for at-home shipping delivery, and further, that it is reasonable to assume, that the Hell-Fire device was delivered to his home address. The Plaintiffs further allege that the device was purchased by a debit card in his name and/or his grandmother's name. It is believed the Hell-Fire trigger system was transported via FedEx Ground Service who facilitated the transfer to the shooter.

## E. - THE YOUNG, UVALDE SCHOOL SHOOTER

4.56    Salvador Ramos was a troubled and violent young man. In the fall of 2021, Ramos was 17 years old, but he had only progressed as far as ninth grade in school. As a result of poor academic performance and attendance, he was involuntarily withdrawn from Uvalde High School on October 28, 2021. Following his withdrawal from high school, Ramos became increasingly socially withdrawn. His relationship with his girlfriend ended, and he began harassing his ex-girlfriend and her social circle. His few remaining friends teased him that he would become a school shooter. He became fixated on notoriety.

4.57    The shooter had a history of mental and behavioral problems and would cut up his face with knives for fun.[9] Uvalde PD was called multiple times due to conflicts between the shooter and his mother.[10] He would drive around with another friend at night to shoot at random people with a BB gun or egg their cars.[11] He wore all black, had long black hair, and wore large military boots.[12] The shooter once commented to a friend he wanted to join the Marines to kill people.[13] While any of these alone may not raise concern; together they paint a dangerous picture that was ignored by all with a duty to notice them and act upon that notice.  Negligence of those with a duty to not harm others is clear.  The many companies that did nothing or encouraged the carnage is negligence. What is clear is that the picture of Salvador Ramos is not that of anyone would or should want to sell the firearms or ammunition he purchased over the last six months to a year prior to May 24, 2022.

---

[9] Robert Klemko et al., *Gunman bought two rifles, hundreds of rounds in days before massacre*, The Washington Post (May 25, 2022),
https://www.washingtonpost.com/nation/2022/025/uvalde-texas-school-shooting-gunman/.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

4.58    The shooter used Yubo and Instagram to send sexually aggressive comments, and threats of kidnap, rape, and death.[14] Multiple teens reported the violent threats made by the account alleged to be the shooter's, but nothing ever came of it.[15] In one chatroom, the shooter bragged about buying his guns and then said that, "girls deserved to get raped." In late 2021, the shooter ordered rifle slings, a red dot sight, and shin guards, as well as the body armor carrier worn on the day of the Robb Elementary School massacre.[16] He asked friends and family members to buy guns for him since he was underage. [17]

4.59    According to Department of Public Safety Director Col. Steven C. McCraw, there was a discussion on Instagram on February 28, 2022, about Salvador Ramos being a "school shooter."[18] Ten days before the shooting, he messaged an individual, "10 more days," to which the person responded, "are you going to shoot up a school or something?" Ramos responded, "No, stop asking dumb questions. You'll see."

4.60    The shooter networked with local peers in ongoing group chats on Snapchat, and played a range of videogames, including the Call of Duty and Grand Theft Auto series, which glamorize guns and encourages murder. Most of his usernames and even his email address reflected themes of confrontation and revenge. The shooter demonstrated interest in gore and

---

[14] Alyson Klein, *The Uvalde Shooter Posted Threats on Yubo. What to Know About the App and Others Like It*, Education Week, (June 2, 2022), https://www.edweek.org/leadership/the-uvalde-shooter-posted-threats-on-yubo-what-to-know-about-the-app-and-others-like-it/2022/06
[15] Silvia Foster Frau, Cat Zakrzewski, Drew Harwell, & Naomi Nix, *Before Massacre, Uvalde Gunman Frequently Threatened Teen Girls Online*, The Washington Post, (May 28, 2022).
[16] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 33 (Tex. 2022).
[17] *Id.* at 34.
[18] Julie Moreno, *There Were Warnings, Clues About Uvalde School Shooting from Social Media Posts, Investigators Say*, KSAT News, (May 27, 2022).
https://www.ksat.com/news/local/2022/05/27/there-were-warnings-clues-about-uvalde-school-shooting-from-social-media-posts-investigators-say/

violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like, as well as sending unexpected explicit messages to others online.[19]

4.61    In early 2022, Ramos began making plans to carry out a school shooting in Uvalde. At the time he started planning, Ramos was 17 years old and thus could not legally purchase guns or ammunition. He asked other people to buy guns for him, which they refused to do. Instead, he began purchasing accessories, including large-capacity magazines, a holographic weapon sight, and a Hell-Fire trigger system, which dramatically increases the rate of fire of a semiautomatic firearm and makes it operationally similar to a fully automatic firearm. He searched online for how to purchase "juggernaut armor," which exists only in *Call of Duty*.

4.62    Ramos was 18 years old on the day of the massacre. In the days before and after his 18th birthday, he bought (or took possession of), 2 AR-15 style, semiautomatic rifles, 60 30-round magazines, and over 2,000 rounds of ammunition. He collected tactical gear and ammunition well before his birthday but could not purchase the firearms legally. He ordered and paid for the guns while still 17 but took possession after his 18th birthday. According to friends and family, he had no firearm experience and had never shot a gun until the massacre.

4.63    The Plaintiffs herein reasonably believe that sometime in March or April 2022, before the shooter was 18 years of age, he purchased at least one AR style rifle from Daniel Defense, an online retailer or merchant of firearms, without age identifications or proof of age being requested by Daniel Defense. Based upon the amount of time it would take to process the sale and to ship the weapon to Oasis firearms, it is reasonable to believe the sale was illegal (at least as to the transaction with Daniel Defense), as the shooter was underage. The purchased

---

[19] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 32 (Tex. 2022)

weapon was defective in that it was engineered to allow modification to permit the weapon to shoot as an automatic weapon by the Hell-Fire system. The Plaintiffs believe  that it is reasonable to assume that AR was purchased by a debit card in Ramos' name and/or his grandmother's name. The AR-15 was shipped via FedEx Ground or UPS to Oasis Outback. Plaintiffs believe the illegal weapons were transported via FedEx Ground Service or UPS, who facilitated their illegal transfer to Oasis and in turn to the shooter. No one questioned the age of the purchaser when Ramos actually paid for the guns to be transported.

4.64    On May 17, 2022, the day after his birthday, Oasis Outback transferred to Ramos a Smith & Wesson M&P15, AR-15 style, semi-automatic rifle. Oasis Outback is a local sporting goods store that also serves as a local firearms dealer to complete online purchases made directly from gun manufacturers. Oasis transferred the supposedly illegally purchased AR style rifle to the shooter, and such transfer was illegal for one, or more, of the following reasons:  Ramos was not 18 at the time of the on-line purchase; the shooter resembled a "shooter"; the shooter used a debit card; and the shooter appeared nervous and/or intoxicated.  ATF rules would require Oasis to not sell to someone who they suspected is impaired or otherwise not qualified to own a firearm, especially a military style weapon.

4.65    On May 17, 2022, the shooter also purchased 1,740 rounds of 5.56mm 75 grain boat tail hollow points for $1,761.50 shipped directly to his house. The purchase of nearly 2000 rounds of ammunition by a person who just turned 18 and "looked like" a school shooter, and in fact earned that nick name from co-workers, did not raise an eyebrow on the part of the Defendants. Red lights, whistles and fire alarms would have gone off on the part of any responsible party.

4.66    On May 18, 2022, the shooter returned to Oasis Outback to buy 375 rounds of 5.56 caliber ammunition. Again, no alarm sounded. Despite the earlier purchase!

4.67     On May 20, 2022, the shooter returned to Oasis Outback to pick up another weapon, an AR-15 style semi-automatic rifle, DDM4 V7, which he bought directly online from Daniel Defense for $2,054.28. The gun had a 16-inch barrel and total gun length of 32 ¼" – 35 7/8." On this date, Oasis  illegally transferred the second AR rifle to the shooter.   The transfer was illegal again for one, or more,  of the following reasons:  the shooter was not 18 at the time of the purchase; the shooter resembled a "school shooter"; the shooter used a debit card; and the shooter appeared nervous and/or intoxicated. This was the shooter's second transfer of an AR rifle from Oasis within a matter of three days, that also should have caused concern.



*The Daniel Defense DDM4 V7 as seen on DanielDefense.com*

4.68     Oasis Outback knew, or should have known, the shooter was suspicious and dangerous. Oasis Outback's owner talked to the shooter and asked him how he could afford $3,000 of guns and ammunition. The owner noticed the shooter was always alone and quiet, all warning signs of a mass shooter. Conveniently, after the shooting, the store owner now claims the shooter did not seem suspicious or raise any "red flags." However, store witnesses who saw the shooter at Oasis Outback buying expensive AR-15 style weapons and large amounts of hollow point

ammunition told the FBI the shooter was "very nervous looking" and "appeared odd and looked like one of those school shooters." Another witness described the shooter's all black clothing as simply giving off "bad vibes." [20]  While in today's world it is all too common to remain silent, the law requires Oasis and its employees to report what they observed.  Oasis was negligent in failing to follow the law and surely of negligence per se.

4.69    The Uvalde school shooters' background check was clean, and Oasis Outback sold him the guns and ammunition knowing he was suspicious and likely dangerous. Oasis did not notify anyone of the purchases of Ramos.  The store owner and his staff did not act on their suspicions and block the purchases or notify law enforcement. The shooter was able to assemble a lethal, military-grade assault weapon with a 30-round capacity magazine capable of pulverizing many people within minutes with no oversight, licensure, experience, or training. All up to this point because Daniel Defense, Firequest International, and Oasis Outback put their profits above safety.

### F. - THE UVALDE SCHOOL MASSACRE ON MAY 24, 2022

4.70    The Uvalde school shooting was one of the worst shootings in Texas' history. The facts contained in this Complaint were compiled without access to police reports, video statements, or autopsy reports as no state agency nor federal agency responded to open records request nor Freedom of Information requests including the ATF, the Uvalde Independent School District, the District Attorney of Uvalde, the Texas Department of Public Safety, the City of Uvalde, The Uvalde Police Department; in an apparent concerted effort to deny the children and families of

---

[20] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 36 (Tex. 2022).

Uvalde Texas Due Process of Law; and an attempt to prevent United States Citizens information about what occurred and to help prevent such mass shootings in the future.

4.71    On the morning of May 24, 2022, the shooter sent a Facebook private message to a girl in Germany telling her he shot his grandmother in the head and would shoot up the elementary school.



*Private message from Ramos on Facebook May 24, 2022*

4.72    Shortly after Ramos shot his grandmother in the face, he stole her vehicle and drove to nearby Robb Elementary School. The shooter's grandmother called the Uvalde PD.

4.73    At 11:28 a.m., the shooter crashed his grandmother's truck into a dry ditch near the school. Two people from nearby Hillcrest Memorial Funeral Home approached the crash scene at 11:29 a.m. and ran when the shooter shot at them with his rifle. The witnesses called 911.



*Aerial map of Robb Elementary School*

4.74    At 11:30 a.m., the shooter, wearing dark clothing and carrying a bag, left the crash scene and climbed a five-foot chain-link fence onto the school property and walked across the open grounds between the fence and the teachers' parking lot towards the school buildings on the west side of the school campus.

4.75    At 11:32 a.m. the shooter reached the west teachers' parking lot adjacent to the building and fired shots through windows into the westmost classrooms before entering the building.

4.76    Armed with at least one AR-15 semi-automatic assault rifle, modified to automatic status, b o d y  a r m o r,  and hundreds of rounds of ammunition, the acts of the shooter were premeditated, and intentional.

4.77    The shooter entered the school through Robb Elementary Schools' west side as children were in the school celebrating their last day of class before the summer break at approximately 11:33 a.m. The back door and lock at Robb Elementary were defective and/or the product of various manufacturing defects. Video footage from inside Robb Elementary showed

the shooter open and enter the school building unabated. It is unknown what would have happened of the door lock had worked but certainly it would have either delayed the shooter or even prevented the shooting.  It was originally reported that the door had been left unlocked but that was not the case, the lock was defective.

4.78    Twenty-four seconds after the shooter entered the school and walked down the hallway, he shot into the classrooms spraying over 100 bullets in 2 ½ minutes killing and injuring many innocent victims. There were no school district police inside the school.

INTENTIONALLY LEFT BLANK



*The Texas Department of Public Safety diagram of Shooter's path in red.*

4.79    At 11:33:24 a.m., the shooter fired rounds from the hallway toward classrooms 111 and 112.[21]

4.80    At 11:33:32 a.m., he entered classroom 111, which was unlocked.[22] The rate of fire was initially very rapid then slowed, lasting only a few seconds.[23] The sound of children screaming was removed from video recordings released to the public.

---

[21] *Id.*

[22] H.R. Robb Comm Interim Rep, Investigative Comm on the Robb Elementary Shooting, 87th Session, at 46 (Tex. 20 22).

[23] *Id.*

4.81    At 11:33:37 a.m., the shooter backed out of classroom 111 into the south hallway and fired shots from the hallway into classroom 112. The shooter then re-entered classroom 111 and continued the shooting spree. The shooter fired over 100 rounds by 11:36 a.m., according to audio analysis.[24] The shooter barricaded himself within the third and fourth-grade classrooms 111 and 112. The modified AR rifle used by the shooter resulted in the inability of people to flee; shortened the time needed to kill this number of children; and made police action largely ineffective as the children were shot within one to three minutes of the shooter entering the school. All of those made the lock very important.

4.82    At 12:50:03 p.m., 77 excruciating minutes after the massacre began, U.S. Border Patrol officers breached the door of Room 111 and fatally shot the shooter.[25]

4.83    During the time between the shooter first reaching Robb Elementary campus until he was shot, the students, teachers, and parents all were held hostage or kidnapped not knowing who was next to lose their life or what friend or family member has breathed their last.  The kidnapping, hostage-taking, injuries and killing were the result of the combined negligence of the Defendants in an amount to be determined by the jury.

4.84    The shooter killed n i n e t e e n  students and left two teachers nearly dead or dying in a reign of terror that terrorized and traumatized all of the children at Robb Elementary.  These children and individuals will never be free of the trauma they experienced, will have increased suicide rates, increased drug abuse and alcoholism, a higher percentage of failed marriages and generally difficult lives. The combined actions (negligence) of the Defendants have resulted these

---

[24] *Id.*
[25] ALERRT Report, at 11.

children, their parents and families of their future and the futures of their children, husbands, wives, girlfriends, and boyfriends.

4.85    This mass shooting was caused and/or approximately caused by the unlawful and negligent actions of the Defendants. The marketing, sales, and transfer of these weapons and modification devices was negligent and/or negligent per se.

### G. - THE GUN DEFENDANTS ARE NOT SHIELDED FROM LIABILITY BY THE PROTECTION OF LAWFUL COMMERCE IN ARMS ACT ("PLCAA").

4.86    The Gun Defendants cannot abate any responsibility for this massacre and attempt to hide behind federal law, The Protection of Lawful Commerce in Arms Act, 15 U.S.C. Sec. 7901, *et. seq.* ("PLCAA"). PLCAA is a federal law that prohibits injured parties from suing gun manufacturers or dealers for personal injuries solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.

4.87    PLCAA is not an absolute bar but is an affirmative defense. Plaintiffs' claims against the Gun Defendants are not prohibited by PLCCA, but expressly allowed. PLCAA allows narrow protection from some claims, while expressly permitting other claims based upon the unlawful or negligent actions of the gun dealer or manufacturer, or violation of a state or federal statute applicable to firearms.

4.88    The Gun Defendants violated federal law by negligently transferring their deadly weapons to the Uvalde school shooter in violation of 15 U.S.C. § 7903(5)(B). The Gun Defendants supplied their lethal products to the Uvalde school shooter when they knew or should have known the shooter was likely to, and did, use the products in a manner involving unreasonable risk of physical injury to others. *See.* 15 U.S.C. § 7903(5)(B). Because the Gun Defendants are liable under federal law, they are not entitled to dismissal.

4.89    The Gun Defendants' PLCAA immunity is further pierced as they were negligent, grossly negligent, and negligent per se in their regard to marketing, promoting, advertising, sale, and distribution of unreasonably dangerous weapons and equipment. It has long been recognized that providing those under the age of 21 with access to deadly weapons and ammunition poses a grave and unacceptable risk to public safety. For this reason, federal law, and many state laws, restrict access to both firearms and ammunition to juveniles and minors. This claim is substantiated by the letter from twelve United States senators to the Federal Trade Commission, which is further evidence of false, deceptive, and misleading advertising which regulates the Defendants from the protection of the act.

## V.
## FIRST CAUSE OF ACTION:

### NEGLIGENT MARKETING AND DISTRIBUTION OF UNREASONABLE DANGEROUS PRODUCT AS TO ALL DEFENDANTS

5.1    Plaintiffs realleges and incorporates each of the preceding paragraphs, and all subsequent paragraphs.

5.2    The shooter murdered twenty-one victims with the firearms, equipment, and ammunition he obtained from the Gun Defendants. Plaintiffs seek to hold Defendants legally responsible for their complicity in the entirely foreseeable, deadly use of the assault-style weapons, modifiers, and ammunition that they placed and transported in the marketplace.

5.3    The Gun Defendants in this action who provided the shooter with his weaponry and ammunition callously, and inexcusably, ignored these known and obvious dangers.

5.4    Gun Defendants spend millions each year advertising, marketing, cataloging and web listing schemes to ensure continued, and unreasonable dangerous sale of deadly firearms, attachment/modifiers, equipment, and ammunition for dangerous use. Gun Defendant's scheme

involved and continues to involve a calculated and deceitful marketing and sales scheme intentionally focused on prodding inappropriate, vulnerable, and unsuitable users with dangerous and deadly firearms.

5.5     Despite the unreasonable risks associated with selling assault rifles, firearm modifiers, and ammunition under these circumstances, these Gun Defendants continue to market, promote, and sell these said objects to inappropriate, vulnerable, unsuitable, and at-risk users. The manners of advertising makes the sales of these products false and violates the immunity provided.

5.6     Gun Defendants as manufacturers, designers, marketers, distributors, and sellers, owed a duty of care to Plaintiffs to ensure they marketed and sold firearms, firearm attachments, modifiers, and ammunition for approved uses. Instead, Defendants engaged in a systematic effort to manufacture, advertise, market, distribute, and sell said dangerous objects to inappropriate, vulnerable, unsuitable, and at-risk users, including the shooter Ramos.

5.7     Gun Defendants' products were expected to and did reach the shooter Ramos without a substantial change in condition as manufactured, marketed and sold by Defendants.

5.8     The Gun Defendants had a duty to market their products in a truthful manner and not mislead consumers about the characteristics of their products. The Gun Defendants had a duty to market their products, which they known are dangerous in the hands of young, untrained adults, in a reasonable and prudent manner. The Gun Defendants, and each of them, breached their duty of care and failed to act as a reasonable weapons manufacturer and seller would in similar circumstances by failing to be truthful in their marketing and directly targeting classes of consumers known to misuse their products to harm others. Gun Defendants have a duty in their role in manufacturing, marketing, distribution, and sale of AR-15 semi-automatic assault rifles,

firearm attachments, equipment, and ammunition which was used during the mass shooting in Uvalde on May 24, 2022.

5.9     The Defendant, Daniel Defense, manufactured the AR-15 which they knew had been modified in the past, and could be easily modified into an illegal automatic weapon.  The AR was classified as an assault-style "weapon and outlawed under the assault weapons ban that lapsed in 2004.  In no manner could the Daniel Defense manufacturers and distributors be unaware of the danger of such weapons, particularly if they are modified, and particularly if they are sold to underage children, who have taken on the archetypal appearance of persons involved in school shootings.   The Defendant Daniel Defense placed the weapon they manufactured into the stream of commerce by selling the weapons on-line without screening the purchaser for age, criminal records, intoxicated demeanor, etc. or medical capacity to responsibly use the product they sold to be irresponsible used by the very person they should not have sold the weapon to a school shooter.

5.10    In addition, Oasis Outback had a duty to not to sell weapons to the 18-year-old Uvalde shooter it knew or should have known, based on actual and constructive knowledge, had the characteristics of a school shooter, and who appeared suspicious. Oasis Outback, its owner, and staff, knew, or should have known, due to the shooter's age, inexperience, appearance, demeanor prior purchases, and display of young school shooter characteristics, the shooter intended to use the guns and ammunition to injure and kill people. Oasis Outback breached its duty of care and failed to act as a reasonable weapons manufacturer and seller would in similar circumstances.

5.11    Moreover, Firequest had a duty to market its products in a truthful manner and not mislead customers into believing the Hell-Fire Gen 2 trigger system was legal, when in fact,

Firequest knew, or should have known, that the Hell-Fire Gen 2 trigger system was classified as a "machine gun" under ATF regulations and was therefore unreasonably dangerous and illegal.

5.12   The Defendant Oasis transferred the two AR weapons, which could be easily modified into an automatic and illegal weapon into the hands of the shooter; without screening of illegal purchase; and ammunition that was used in the Robb Elementary School massacre are partly to blame for placing on the market, advertising, and selling said dangerous weapons and objects. Plaintiffs will show other ways during discovery in this matter.

5.13   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs sustained severe physical injuries, severe emotional distress, mental anguish, economic loss, and other damages, including death. As a direct and proximate result, Plaintiffs are entitled to compensatory and equitable damages in an amount proven by a trial.

5.14   Defendants   negligent   marketing   and   sale   of   firearms,   firearm attachments/modifiers, and ammunition was a substantial factor in causing Plaintiffs injuries, losses, and damages described herein.

5.15   As a proximate cause of Defendants' negligence, Plaintiffs have suffered and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## VI.
## SECOUND CAUSE OF ACTION:

### *NEGLIGENCE AS TO ALL DEFENDANTS*

6.1   Plaintiffs realleges and incorporates each of the preceding paragraphs, and all subsequent paragraphs.

6.2     The Gun Defendants were all subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risk of injury.

6.3     The Gun Defendants have a duty to exercise reasonable care in selling and/or shipping firearms, firearm gear, and ammunition, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others. In fact, companies that sell or deliver firearms and ammunition have an obligation to exercise the highest duty of care in transferring these products because of the potential for harm if firearms and ammunition get in the wrong hands.

6.4     On May 17, 2022, and May 20, 2022, Oasis Outback sold Two AR-15 style rifles and hundreds of rounds of ammunition to the freshly 18-year-old shooter. Upon information and belief, one of the AR-15 semi-automatic assault rifle was manufactured and sold by Daniel Defense.

6.5     The shooter also purchased the AR-15 Rifle trigger attachment device, the Hell-Fire, from Defendant Firequest International Inc. The Hell-Fire Stealth system attachment permitted Ramos to transform his semi-automatic AR-15 semi-automatic firearm to fire at a rate approaching that of a fully automatic firearm.

6.6     The  Gun Defendants had actual knowledge' of the shooter's mental condition or his intentions, and reasonably should have known about his purposes in making his purchases: (1) Daniel Defense did not qualify the shooter for age; (2) did not distributed through a retail shop; and (3) Oasis Outback illegally transferred the weapon; (4) Oasis Outback illegally transferred the weapon knowing it was an illegal purchase as the shooter was under 18 years of age; (5) Oasis Outback transferred the weapon to a shooter under 18 years of age at the time of purchase knowing that the AR-15 semi-automatic firearm could be easily modified.

6.7     At all times material to this suit, the Gun Defendants, owed Plaintiffs a duty of reasonable care to ensure the safety, care, and well-being of the public, including Plaintiffs, and had or assumed a duty to exercise reasonable care in executing such duties. Gun Defendants failed to exercise reasonable care, and such failure was negligent and a proximate cause of the incident in question and resulting damages to Plaintiffs. These acts or omissions include, but are not limited to, the following:

   a)   Failing to protect the safety of the public, including the Plaintiffs;

   b)   Failing to follow the laws of Texas in Selling AR-15 semi-automatic rifles, firearm attachments, and ammunition to the mass shooter.

   c)   Failing to enact and follow reasonable policies and procedures for selling firearms and equipment;

   d)   Failing to properly follow applicable law in the marketing and sale of firearms, firearm modifiers, and ammunition;

   e)   Failing to attempt to recover the illegal weapons and equipment sold to the mass shooter after the sale;

   f)   Intentionally blinding themselves to a purchaser who appears to be emotionally disturbed or suffer from violent fantasies;

   g)   Selling firearms, firearm attachments, and copious ammunition to Defendant Salvador Ramos without inquiring into his health and well-being;

   h)   In failing to pay attention or reasonably respond to Salvador Ramos' emotional disturbance;

   i)   In failing to inform law enforcement that Defendant Salvador Ramos was emotionally disturbed and harboring violent fantasies.

   j)   Plaintiffs will show other ways determined during discovery in this matter.

6.8     The Gun Defendants are vicariously liable for the actions or inactions of its agents/employees while acting within the scope of their agency and/or employment.

6.9     Plaintiffs will show that one or more or all of the above-mentioned acts     and/or omissions constitute negligence and gross negligence and were the proximate cause of harm suffered by the Plaintiffs.

**VII.**
**THIRD CAUSE OF ACTION:**

*NEGLIGENT ENTRUSTMENT AS TO ALL DEFENDANTS*

7.1     Plaintiffs realleges and incorporates each of the preceding paragraphs, and all subsequent paragraphs.

7.2     The Gun Defendants had, at all relevant times, actual or constructive knowledge the AR-15 style rifle and modifiers sold to the Uvalde school shooter had no reasonable application to lawful uses of firearm (such as military or self-defense) but instead were well-suited and/or intended for misuse.

7.3     The Gun Defendants had, at all relevant times, actual or constructive knowledge that young adult males are most commonly the perpetrators of mass shootings, including school shootings, and had or should have had actual knowledge at all times of the Uvalde school shooter's date of birth and gender. The failure to determine the age of the shooter is a violation of their duty to Plaintiffs.

7.4     Oasis Outback, the owner, and its staff, had actual knowledge of the Uvalde school shooter's characteristics and dangerous propensities. Oasis Outback sold two AR-15 style rifles and 375 rounds of ammunition to the shooter on May 17, May 18, and May 20, 2022, and installed a holographic sight on the Daniel Defense AR-15 rifle the shooter used in the shooting. Oasis Outback's owner talked to the shooter and asked him how he was able to afford $3,000 of guns and ammunition. Obviously, the shooter and his purchase raises a red flag that the owner failed to follow yet another breach of duty. The owner noticed the shooter was always alone and quiet. Store

witnesses told the FBI the shooter was "very nervous looking" and "appeared odd and looked like one of those school shooters." Another witness described the shooter's all black clothing as simply giving off "bad vibes." Despite the shooter's young age, inexperience, appearance, display of dangerous characteristics, and profile of a young adult school shooter, Oasis Outback entrusted and sold the AR-15 rifles and ammunition to him just days after his 18th birthday. Oasis Outback, its owner, and staff, knew, or should have known, due to the shooter's age, inexperience, appearance, demeanor, and display of young school shooter characteristics, the shooter intended to use the guns and ammunition to injure and kill people. Moreover, Oasis Outback has the right to refuse service to anyone.

7.5     All Defendants had a duty not to entrust a lethal weapon to a person having and/or displaying dangerous propensities or indicating a propensity to harm and kill others.

7.6     As a proximate cause of the Gun Defendants' negligent entrustment of guns, ammunition, and accessories to the shooter, the shooter was able to acquire and misuse the weapons causing the school massacre on May 24, 2022. The Uvalde school shooting was a foreseeable consequence of the Gun Defendants' negligent entrustment of the weapons to the shooter. The Gun Defendants' negligent entrustment of the weapons to the shooter caused the Plaintiffs to suffer, and continue to suffer, physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of life.

7.7     As a proximate cause of the Gun Defendants' negligent entrustment, Plaintiffs have suffered and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

# VIII.
## FOURTH CAUSE OF ACTION

### *NEGLIGENT HIRING, TRAINING AND SUPERVISION*
### *AS TO OASIS OUTBACK*

8.1     Plaintiffs realleges and incorporates each of the preceding paragraphs, and all subsequent paragraphs.

8.2     At all times material to this suit, the Oasis Outback owed Plaintiffs a duty of reasonable care to ensure the safety, care, and well-being of the public, including the Plaintiffs. These duties include, but are not limited to, the hiring, retention, and supervision of trained employees to ensure that all legally required guidelines are fulfilled at the time of selling of firearms and ammunition. Oasis Outback breached these duties when its employee(s) sold rifles and ammunition to the mass shooter in violation of existing laws. The acts or omissions that constituted the breach of these duties include, but are not limited to:

a.     Failing to instruct Oasis Outback employees regarding applicable state and federal firearms laws and regulations in order to ensure that all sales of firearms are legal;

b.     Failing to ensure that Oasis Outback employees were up to date about revisions and amendments to applicable state and federal firearms laws and regulations;

c.     Failing to monitor the compliance of Oasis Outback employees with applicable state and federal firearms laws and regulations; and

d.     Failing to train Oasis Outback employees to call law enforcement to investigate if they believe an illegal transfer of sale is occurring or has occurred.

8.3     The Oasis Outback Defendants breached these duties when its employee(s) sold rifles to the mass shooter, in violation of existing laws.

8.4     Whether Oasis Outback had actual or constructive knowledge of each of its employees' sale transactions with its patrons, The Oasis Outback Defendant failed to properly

supervise and/or control its actions. Specifically, The Oasis Outback Defendant's following acts omissions constitute negligence:

    a.    Entrusting Oasis Outback's employees who lack adequate training and education concerning firearms and governing laws, with the administration and sale of firearms;

    b.    Failing to properly train employees regarding the appropriate methods, safety practices, and supervision for customers purchasing firearms;

    c.    Failing to properly supervise, monitor, and/or control employees tasked with selling firearms to the public, so they followed "ALL" Federal laws, rules and regulations in their sale or transfer of firearms;

    d.    Failing to properly screen and perform investigative due diligence on prospective customers prior to selling them firearms;

    e.    Failing to continually monitor and/or screen their employees to ensure they are fit to sell firearms to the public, they are following "ALL" Federal laws, rules and regulations in their sale or transfer of firearms;

    f.    Failing to appropriately discipline and/or reprimand its employee(s)after the shooting; and

    g.    Failing to properly follow the instructions and details as contained in ATF Form 4473.

8.5 Plaintiffs will show that one or more or all of the above-mentioned acts and/or omissions constitute negligent hiring, training, and supervision and were the proximate cause of harm suffered by the Plaintiffs.

## IX.
## <u>FIFTH CAUSE OF ACTION:</u>

### *NEGLIGENT SALE AS TO DANIEL DEFENSE AND OASIS OUTBACK*

9.1    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

9.2    Defendant Daniel Defense and Oasis Outback had a duty to exercise reasonable care in selling firearms and ammunition, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

9.3     Defendant Daniel Defense and Oasis Outback's sales of ammunition and an AR-15-style rifle to the shooter breached their duty to exercise reasonable care. Despite his youth and having just turned 18 days before, the shooter spent thousands of dollars on multiple guns and large quantities of ammunition at and through Oasis Outback over a four-day period, which was sufficiently unusual that it caused Oasis Outback's owner to question the shooter as to where he got the money.

9.4     Other patrons at the store noticed the shooter acting unusual and nervous at the store during these repeat visits. He dressed in all black and, as one customer described him, he looked "like one of those school shooters."

9.5     Oasis Outback knew or reasonably should have known that Ramos was dangerous person who was likely to use the firearms and ammunition he obtained from Oasis Outback for unlawful purposes, including to injure and kill people.

9.6     Oasis Outback has the right to refuse service to anyone.

9.7     Oasis Outback is a licensed seller of firearms. It sold ammunition and a firearm to the shooter when it knew, or reasonably should have known, that the person to whom the ammunition and firearm being supplied, the shooter, was likely to use the product in a manner involving unreasonable risk of physical injury to other persons; and in fact, Ramos did so use it.

9.8     This claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

9.9     These acts were a but for and proximate cause of the Plaintiffs' injuries, as well as their substantial and unnecessary physical pain, mental anguish, and emotional suffering.

9.10    Oasis Outback's negligent sales proximately caused the Plaintiff Federico Torres to lose the love, support, nurture, and companionship he would have shared with his son for the rest of his life.

9.11    Oasis Outback also caused, through its negligent sales, the Plaintiffs to suffer and continue to suffer economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

## X.
## SIXTH CAUSE OF ACTION

### *AGENCY AS TO OASIS OUTBACK*

10.1    For the transaction that made the basis of this case, Oasis Outback acted as the agent or agent in fact of Daniel Defense. Oasis had authority to deliver the weapon Salvador Ramos purchased from Daniel Defense, Oasis had authority to act or not act under the ATF, and Oasis had the responsibility to determine if Ramos was fit to purchase the weapon. Oasis was negligent in their actions.  Oasis had real and "apparent" authority to act on behalf of Daniel Defense and as Daniel Defense's agent.  Daniel Defense is responsible for the actions and inactions of Oasis.

## XI.
## SEVENTH CAUSE OF ACTION:

### *GROSS NEGLIGENCE AS TO ALL DEFENDANTS*

11.1    Plaintiffs hereby assert a claim for gross negligence. Pursuant thereto, Plaintiffs seek punitive or exemplary damages in order to punish and deter the outrageous conduct taken in the needless, reckless and conscious indifference for the safety of the Plaintiffs herein and their fellow students and teachers.

11.2    All Defendants were grossly negligent in selling and delivering firearms, firearm attachments, equipment and/or ammunition and involved an extreme degree of risk, considering the probability and magnitude of potential harm to the plaintiffs and public.  All defendants proceeded with conscious indifference to the rights, safety, or welfare and the general public. As set forth herein, the acts and/or omissions of Defendants were also knowing and willful failures to abide by the applicable safety guidelines regarding the purchase and sale of firearms in the State of Texas. These actions and/or omissions constitute malicious, willful, wanton, grossly negligent and/or reckless conduct. Said acts/or omissions proximately caused or contributed to Plaintiffs' injuries and damages set out herein, and as such, give rise to warrant, the imposition of a jury of significant punitive damages in an amount to be determined by the jury.

11.3    Plaintiffs allege that the conduct of all defendants amounted to gross negligence and/or malice as those terms are defined under Tex. Civ. Prac. & Rem. Code Ch. 41, (§ 41.001, *et. seq.*), as well as Texas Common Law.

## XII.
## EIGHTH CAUSE OF ACTION:

### *PRODUCTS LIABILITY- MANUFACTURING DEFECT*
### *AS TO ALL DEFENDANTS*

12.1    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

12.2    Plaintiffs bring this liability claim against Gun Defendants for manufacturing defect.

12.3    At all relevant times, Gun Defendants researched, tested, developed, manufactured, marketed, sold firearms, firearm equipment, modifiers, and attachments. At all relevant times, the Gun Defendants designed, marketed, sold, firearms, firearm equipment, modifiers, and

attachments. The defendants' products deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.

12.4    Based on information and belief, Defendants' products were defective and unreasonably dangerous because the firearms and equipment they designed, marketed, and sold could be modified into a military -type automatic weapon. The products were defective when they left the hands of the manufacturer

12.5    Defendants are liable to Plaintiffs for injuries caused as a result of their products' manufacturing defects.

12.6    The products' defects were substantial and a proximate cause of Plaintiffs' injuries.

12.7    As a proximate cause of Defendants' conduct, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## XIII.
## NINETH CAUSE OF ACTION:

### PRODUCTS LIABILITY – MARKETING DEFECT AS TO
### ALL DEFENDANTS

13.1    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

13.2    Plaintiff brings this liability claim against the Gun Defendants for marketing defect and its intentional marketing to untrained civilians and young adults without adequate warnings.

13.3    The Gun Defendants aggressively market lethal weapons to youth, civilians, and young adults they know are not competent by maturity, skill, training, or experience to responsibly

use an assault weapon such as an AR-15 style rifle, with high-capacity magazines and trigger systems and appreciate the risk of harm to others. The Gun Defendants have actual or constructive knowledge that AR-15 style rifles, rapid-fire trigger systems, and high-capacity magazines are used by most often by young adults in mass shootings. The Gun Defendants have actual or constructive knowledge that young adults, due to the process of brain development and biological maturation are not competent emotionally to safely use their products without adequate training, guidance, and/or supervision and/or within the setting of a safe and supervised environment. The Gun Defendants further have actual or constructive knowledge that the young adult civilian consumers its sells to and/or targets do not have the experience or expertise to appreciate the risk of harm to others if proper warnings, training, guidance, and instruction is not provided.

13.4    The Gun Defendants' products fail to warn civilian and young adult consumers that adequate training, guidance, and/or supervision is necessary to ensure the safe use of their products. Because of the age, inexperience, and vulnerability of the young adult civilian consumers adequate training, guidance, instruction, precaution, and supervision is necessary for safe use of the products. A risk of harm was inherent in the defendant's product or might arise from the intended or reasonably intended use of the product.

13.5    The Gun Defendants' products fail to warn young adult consumers that use of their products by young adult consumers carries a high risk of harm to self and others given the emotional, physical, and psychological development changes of young adults resulting in mood and behavior instability and volatility.

13.6    As a result of Defendants' marketing defects, Defendants products were defective and unreasonably dangerous when they left the possession and/or control of Defendants and used by the Uvalde school shooter on the day of the school shooting. The defendants knew or could

reasonably foresee the risk of harm at the time the product was marketed. The lack of instructions or warnings rendered the product unreasonable dangerous to the ultimate user or consumer of the product, and the failure to warn or instruct caused the Plaintiffs' injuries.

13.7    As a proximate cause of Defendants' marketing defects, Plaintiffs suffered, and continue to suffer physical and emotional damages, increased medical and mental healthcare visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

## XIV.
## TENTH CAUSE OF ACTION:

### *TEXAS DECEPTIVE TRADE PRACTICES ACT AS TO ALL DEFENDANTS*

14.1    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

14.2    The Deceptive Trade Practices Act (DTPA) prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." DTPA § 17.46 (a).

14.3    The Plaintiffs named herein are "consumers" as required by the DTPA.

14.3    The Gun Defendants have marketed firearms and firearm products to consumers as a safe and proven product to protect themselves and their homes. Consumers should be informed of all the substantial and unavoidable risks that come with firearm and firearm modifier ownership, possession, and use. The gun Defendants' marketing and advertising made material misrepresentations that were false and misleading.

14.4    Defendants, as alleged above, are engaging or have engaged in false, misleading, or deceptive acts or practices in the conduct of trade or commerce, in violation of DTPA 17.46(b) as follows: a. "[R]epresenting that goods or services have sponsorship, approval, characteristics,

ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not," DTPA § 17.46(b)(5)); and b. "[F]ailing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed," DTPA § 17.46(b)(24). And c. causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services in violation of DTPA § 17.46(b)(2).

14.5     The Gun Defendants have, by means of these unlawful acts and practices, obtained money from consumers who are entitled to restitution, or in the alternative, has caused actual damages to identifiable persons who are entitled to compensation.

14.6     As a proximate result of the Defendants' conduct, which contributed to Plaintiffs' injuries and death, Plaintiffs are entitled to recover, in excess of the minimum jurisdictional limits of this Court. Because Defendants have engaged in the unlawful acts and practices described above, Defendants have violated the law as alleged herein.

## XV.

## PUNITIVE/EXEMPLARY DAMAGES AS TO THE GUN DEFENDANTS

15.1     Each Defendant's conduct was done with reckless disregard for human life, oppression, and malice. Defendants, and each of them, were aware of the serious and demonstrable risk of serious bodily injury and death associated with their conduct and that such risks are compounded and worsened by their intentional inaction. With full knowledge of such risks, Defendants proceeded causing Plaintiffs to suffer and sustaining severe physical, mental, and emotional harm.

# XVI.
# DAMAGES

## A. AS TO PLAINTIFF FEDERICO TORRES INDIVIDUALLY, AS THE REPRESENTATIVE OF THE ESTATE AND AS NEXT FRIEND OF R.T., (10 YEARS OF AGE)

16.1    Plaintiff Federico Torres brings this suit individually and as next friend of R.T., who was 10 years old at the time of his death. Federico Torres and his family have lost the love, support, nurture and companionship they would have shared with their son for the rest of their lives. Further, as a result of the wrongful death of R.T., his estate is entitled to seek damages for the pain, suffering, and mental anguish he suffered prior to his death, including the damages incorporated herein stated above, but also the damages his estate will have incurred for his funeral and burial expenses.

16.2    Damages loss of inheritance under Wrongful Death Act.

16.3    The specific element of damages suffered by Federico Torres individually and as next friend of R.G., will be more fully described in the discovery process. Plaintiffs preserve the right to plead additional and more specific damages in the future as more facts become known. The above-mentioned elements of damages are those that Plaintiffs have suffered in the past up to the time of trial, but in addition, those that they, in reasonable probability, will continue to suffer in the future.

## B. - DAMAGES AS TO PLAINTIFF ARNULFO REYES

16.4    Plaintiff Arnulfo Reyes is the surviving teacher who was shot three times on May 24, 2022, as he attempted to lock the door to his classroom. Mr. Reyes heard his students murdered and was alone in the room with the shooter for 77 minutes unaware whether he would live or die.

16.5    Plaintiff Arnulfo Reyes suffered injuries to his arm, back, and other parts of his body as a result of gunshot wounds inflicted by Defendant Salvador Ramos. In all reasonably

probability, Plaintiff Arnulfo Reyes will continue to suffer in this manner for a long time into the future, if not for the remainder of his natural life. The injuries have had a serious effect on Plaintiff Arnulf Reyes' health and wellbeing.

16.6    Plaintiff is entitled to seek damages for the pain, suffering, and mental anguish he suffered, including the damages incorporated herein stated above, but also actual damages to repair the wrongs or to compensate for severe physical injuries.

16.7    General damages which are the unusual accompaniment of this particular type of wrongdoing, that is the Plaintiff has incurred extreme physical suffering and disability, and loss of employment.

16.8    Special damages arising from acts which are foreseeable.

16.9    Reasonable and necessary medical expenses.  Mr. Reyes has incurred numerous medical bills and hospital bills due to his severe and life-threatening injuries.

16.10   Future medical expenses reasonable probability that they will incur in the future.

16.11   Physical pain and suffering.

16.12   Mental pain and suffering.

16.13   Mental anguish, more than anguish and resentment, that is grief, severe disappointment, indignation, wounded pride, shame despair, public humiliation: severe disruption in daily routine.

16.14   Loss of his income from his flower and gift shop, that is Arnie's Nursery and Gifts, on 640 N Grove St., Uvalde, Texas 78801; that is approximately $16,000.00 per year.

16.15   Physical impairment and loss of enjoyment of life, loss of Plaintiff's former lifestyle, including loss of ability to play sports, have a normal social life loss of service his mother

to perform household services in to administer to the needs of his mother, Rosemary Reyes, who he lived with and now must aid him.

16.16   Loss of consortium parent-child relationship loss of companionship.   Arnulfo Reyes' Mother, Rosemary Reyes, who has suffered loss of consortium with her adult child. Therefore, in her elderly years she lost the companionship of her son and is now facing a lifetime of acting as a caregiver for her adult son.

16.17   Loss of impairment of past and future earnings capacity. The Plaintiff is disabled as a schoolteacher and disabled from performing any job or occupation due to his severe injuries. Therefore, the Plaintiff has lost wages as a schoolteacher throughout his life; lost wages at his flower shop; lost retirement income due to his lost wages and his inability to pay into his retirement income.

16.18   The specific element of damages suffered by Arnulfo Reyes will be more fully described in the discovery process. Plaintiffs preserve the right to plead additional and more specific damages in the future as more facts become known. The above-mentioned elements of damages are those that Plaintiffs have suffered in the past up to the time of trial, but in addition, those that they, in reasonable probability, will continue to suffer in the future.

## C. - DAMAGES AS TO PLAINTIFF DAVID TREVINO, INDIVIDUALLY AND AS NEXT FRIEND OF I.T. A MINOR (11 YEARS OF AGE)

16.19   Prior to the hostage, kidnapping situation, I.T. was a healthy, normal, 11-year-old. As a result of the damages inflicted upon her by Defendants, she has suffered severe personal injuries including the onset of heart problems directly attributed to the Defendants actions. She has also exhibited self-harming behavior, been under suicide watch and hospitalized as a result of mental anguish, anxiety, suicidal tendencies, depression and the overall deterioration of her health. Prior to the incident she had not and was not suffering from any of these conditions.

16.20   David Trevino is entitled to seek damages for the pain, suffering, and mental anguish he suffered, including the damages incorporated herein stated above, but also actual damages to repair the wrongs or to compensate for severe physical injuries.

16.21   General damages which are the unusual accompaniment of this particular type of wrongdoing, that is the Plaintiff has incurred extreme physical suffering and disability, and loss of employment.

16.22   Special damages arising from acts which are foreseeable.

16.23   Reasonable and necessary medical expenses.

16.24   Future medical expenses reasonable probability that they will incur in the future.

16.25   Physical pain and suffering.

16.26   Mental pain and suffering.

16.27   Mental anguish more than anguish and resentment, that is grief, severe disappointment, indignation, wounded pride, shame despair, public humiliation: severe disruption in daily routine.

16.28   Physical impairment and loss of enjoyment of life, loss of Plaintiff's former lifestyle, including loss of ability to play sports, have a normal social life.

16.29   Loss of impairment of past and future earnings capacity.

### D. - DAMAGES AS TO ALL PLAINTIFFS

16.30   As a proximate cause of Defendants' conduct, Plaintiffs FEDERICO TORRES, Individually and as Representative and ANF of R.T., Et. al., suffered, and continue to suffer damages, increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and

treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

16.31   As a proximate cause of Defendants' conduct, the adult Plaintiffs, parents and guardians, of the children present at the shooting at Robb Elementary School suffered loss of consortium and/or companionship with their children, emotional stress, lost wages on the day of the shooting, lost wages as to time off from work to take their children to medical, psychological, and psychiatric problems, and emotional problems such as loss of sleep, weight gain and/or weight loss, additional time to devote to their children's emotional needs, and will continue to incur these losses and expenses in the future.

16.32   As a proximate cause of Defendants' conduct, the children present at the shooting at Robb Elementary suffered emotional stress; physical and emotional damages; increased medical and mental health care visits, and loss of enjoyment of childhood and economic losses, including considerable financial expenses for medical and mental healthcare and treatment, and diminished income capacity, and will continue to incur these losses and expenses in the future.

16.33   The Plaintiffs, that is the adults and their children, suffered non-economic damages, that are, mental or emotional pain or anguish, loss of consortium, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than actual damages.

16.34   Special damages arising from acts which are foreseeable.

16.35   Prejudgment interest.

16.36   Post-judgment interest

16.37   Reasonable and necessary medical expenses.

16.38   Future medical expenses reasonable probability that they will incur in the future.

16.39 Mental pain and suffering; that is, mental anguish more than anguish and resentment grief, severe disappointment, indignation, wounded pride, shame despair, public humiliation; severe disruption in daily routine; and foreseeable Bystander anguish.

16.40 As to the parents and guardians: loss of consortium of parent-child relationship; that is, loss of companionship which is relatively severe to affect relationship with their children.

16.41 Subsequent aggravation by plaintiff or third-party recoverable traceable to primary negligence cut off:

    a. Past medical expenses;

    b. Future medical expenses;

    c. Pain and suffering in the past;

    d. Pain and suffering in the future;

    e. Mental anguish in the past;

    f. Mental anguish in the future;

    g. Bystander damages;

    h. Lost wages;

    i. Prejudgment interest;

    j. Post judgement interest;

    k. Exemplary damages;

    l. Loss of enjoyment in life in the past;

    m. Loss of enjoyment in life in the future;

    n. Other reasonable consequential damages.

16.42 Personal injury damages including loss of wage-earning capacity in the future, medical expenses, mental anguish, and damages to the person of each plaintiff.

16.43   Plaintiffs herein suffered injuries due to the events that occurred on May 24, 2022. These injuries include, but are not limited to, post-traumatic stress disorder, fear, nightmares, extreme anxiety, depression, and insomnia. In all reasonably probability, Plaintiffs will continue to suffer in this manner for a long time into the future, if not for the remainder of their natural lives. The injuries have had a serious effect on bystander mental anguish for the injuries caused to third person, by a closely related person, mental anguish for a family member , which listed in the wrongful death act; reasonable without proof of physical injury suits based upon an intentional or willful act; disfigurements scarring, amputations deformity changes in appearance; can be proved by plaintiffs testimony and inspection by the jury; physical impairment loss of enjoyment of life-loss of Plaintiff's former lifestyle, including loss of ability to play sports, have a normal social life loss of service increase capacity of the injured spouse to perform household services in to administer to the needs of the other spouse and family evidence of what services the spouse cannot perform.

16.44   Loss of service of minor child, and the evidence of minors and their capacity to perform services, which may be inferred from child's personality and family relationships.

16.45   Actual damages to repair the wrongs or to compensate for severe physical injuries.

16.46   "Compensatory damages", that is economic and noneconomic damages.  The term does not include exemplary damages.

16.47   "Future damages" means damages that are incurred after the date of the judgment. These include medical bills, loss of wages, impaired earning capacity.

16.48    "Future loss of earnings" means a pecuniary loss incurred after the date of the judgment, including loss of income, wages, or earning capacity, and loss of inheritance.

16.49    The specific elements of damages suffered by each Plaintiff will be fully described during the discovery process.  The Plaintiffs preserve the right to plead additional and more specific damages in the future as more facts become known. The above-mentioned elements of damages are those that Plaintiffs have suffered in the past up to the time of trial, but in addition, those that they, in reasonable probability, will continue to suffer in the future.

## XVII.
## WRONGFUL DEATH AND SURVIVAL CLAIMS

17.1    Plaintiff Federico Torres is the statutory beneficiary of the deceased. Plaintiff Torres is therefore entitled to bring these causes of action pursuant to the Texas Wrongful Death Act and Texas Survival Statutes set out in Texas Civ. Prac. & Rem. Code Ch. 71. Plaintiffs, as heirs and next friend of R.T. seek damages for the injuries and deaths of the deceased and their own consequent injuries and damages against Defendants.

## XVIII.
## SPOILIATION

18.1    Plaintiffs demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the Uvalde school shooting or other violations made the basis of the Complaint and the alleged damages, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence. Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation inference rule- an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

## DEMAND FOR A JURY TRIAL

Plaintiffs respectfully demand a trial by jury.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request judgment against Defendants as follows:

a.  Compensatory damages against all Defendants in an amount to be determined at trial;

b.  Punitive/ exemplary damages against the Gun Defendants in an amount to be determined at trial;

c.  Reasonable attorneys' fees and costs;

d.  Pre-and post-judgment interest; and

e.  Such other and further relief as this Court may deem just and proper.

June 7, 2023.

Respectfully submitted,

**WILLIAMS ATTORNEYS, PLLC**

By: /s/ *Justin L. Williams*
JUSTIN L. WILLIAMS
SBN: 21555800
500 N. Water Street, Suite 500
Corpus Christi, TX 78401
Telephone: (361) 885-0184
Facsimile: (361) 885.0309
Service Email: service@williamstrial.com